*United States v. Patterson*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2021

No. 19-4332-cr

UNITED STATES OF AMERICA,
*Appellant*,

v.

JUSTIN PATTERSON,
*Defendant-Appellee*,

On Appeal from the United States District Court
for the Southern District of New York

ARGUED:  AUGUST 23, 2021
DECIDED:  FEBRUARY 4, 2022

Before:  RAGGI, LYNCH, and PARK, *Circuit Judges*.

In this case, in which defendant Justin Patterson stands charged with one count of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1), the government appeals from an order of the United States District Court for the Southern District of New York (Seibel, *J*.),

suppressing the charged firearm because it was seized in circumstances amounting to an arrest not supported by probable cause. The government argues that Patterson's initial detention in a motor vehicle was not an arrest but an investigatory stop supported by the requisite reasonable suspicion and that circumstances highlighted by the district court in finding an arrest—specifically, police officers pointing firearms at, shouting toward, and blocking an exit route for the motor vehicle being driven by Patterson—were reasonable safety precautions given that the officers were investigating a report of menacing with a firearm. We agree.

REVERSED AND REMANDED.

---

JAMES LIGTENBERG, Assistant United States Attorney (Michael D. Maimin, Anna M. Skotko, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, New York, *for Appellant.*

YUANCHUNG LEE, Federal Defenders of New York, Inc., New York, New York, *for Defendant-Appellee.*

---

REENA RAGGI, *Circuit Judge*:

Defendant Justin Patterson stands charged in the United States District Court for the Southern District of New York (Cathy Seibel, *J.*) with one count of being a felon in possession of a firearm. *See* 18

U.S.C. §§ 922(g)(1) & 2.[1] The subject firearm, a loaded Makarov pistol, was seized from the Chevrolet Camaro that Patterson was driving on the night of January 30, 2019, in Cortlandt, New York. State and county police had detained the vehicle at a gas station because it fit the description of a car whose occupants had reportedly menaced a woman with a firearm in a nearby supermarket parking lot. The district court granted Patterson's motion to suppress the firearm, orally ruling on October 30, 2019, that (1) the degree of force used by police in detaining Patterson's vehicle and its occupants— specifically, pointing firearms at, shouting orders toward, and blocking an exit route for the vehicle—exceeded that permissible for a reasonable investigatory stop and, thus, had to be viewed as a *de facto* arrest; (2) the arrest was unlawful because, when first effected, it was not supported by probable cause; and (3) thus, the firearm seized from the car's glove compartment after Patterson fled the scene had to be suppressed as a fruit of the unlawful arrest.

The district court memorialized its suppression ruling in a written order dated December 27, 2019, which the government now appeals pursuant to 18 U.S.C. § 3731. The government argues that Patterson's initial detention in a motor vehicle was not an arrest but a lawful investigatory stop because (1) it was supported by reasonable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); and (2) the police actions found excessive by the district court were reasonable safety

---

[1] Although the indictment does not specify Patterson's prior felony conviction, the sworn complaint dated March 6, 2019, identifies a prior New York State conviction for second-degree assault intending to cause physical injury with a deadly weapon or dangerous instrument, an offense punishable by imprisonment of more than one year. *See* N.Y. Penal Law § 120.05(2).

precautions given that officers were investigating a report of menacing with a firearm. We agree with these arguments and further conclude that other challenges to the firearm seizure are meritless as a matter of law. Thus, we reverse the district court's suppression order, and we remand the case for further proceedings consistent with this opinion.

## BACKGROUND

As the district court observed, the facts relevant to Patterson's motion to suppress are largely undisputed, with many of the pertinent events recorded on audiotapes or videotapes that are part of the record.[2]

### I. The 911 Call for Help

At approximately 8:47 p.m. on January 30, 2019, a woman in Cortlandt, New York—a town in Westchester County—dialed 911 and, identifying herself by name, address, and telephone number, requested that police go to her home at 3469 Lexington Avenue. The caller explained that two black men in a black Camaro had threatened her with a gun at a nearby ShopRite parking lot and had gone to her home in search of her son.[3]

---

[2] As the district court also observed, the time stamps on some of the recordings appear to be misaligned across law-enforcement agencies, sometimes by as much as two minutes. This discrepancy, however, does not affect our analysis.

[3] In the recorded 911 call, the menacing victim was not clear as to whether the men who had threatened her were already at her home or en route. *Compare* Joint App'x, Disc Ex. 1 at 0:26 (stating that "there's a car that was following me home and I'm home and they're looking for my son"), *and id.* at 0:38 (stating that men

## II.    The Police Radio Exchanges

Within minutes, at approximately 8:52 p.m., a New York State Police radio dispatcher put out an announcement calling for officers to respond to the 911 caller's 3469 Lexington Avenue address.  The dispatcher stated that "a menacing [had] occurred in the ShopRite parking lot" and that the suspects were "two black males" in "a black Camaro" who had "displayed a handgun."  Joint App'x, Disc Ex. 2A at 0:15–0:40.  The dispatcher directed officers to "start over to 3469 Lexington" because the "two suspects are possibly en route" to that location, and "they're looking for [name of caller's son] at that location."  *Id.* at 0:08–0:12, 0:20–0:24, 0:39–0:42.

Moments later, a Westchester County Police dispatcher contacted County Police Officer David DiRienzo, directing him to go to 3469 Lexington Avenue to support State troopers investigating a "menacing with a handgun at ShopRite."  Joint App'x, Disc Ex. 2C

---

were "over here on the complex where I live"), *and id.* at 2:08 (stating that she "see[s] a black car" in her parking lot), *with id.* at 0:54 (stating that she believes men "should be in the parking lot waiting"), *and id.* at 1:29 (stating that she "has to get home" and is "on [her] way home"), *and id.* at 3:28 (confirming that she is en route home and agreeing to follow operator's instruction to delay going home to let police arrive first).  The district court's reliance on the first set of statements in its findings of fact makes no difference on this appeal because none of the officers whose conduct is here at issue heard the 911 call, and, thus, as Patterson himself acknowledges, the call's contents cannot be imputed to them.  *See United States v. Colon*, 250 F.3d 130, 137–38 (2d Cir. 2001).  What matters is the information the responding officers thereafter received from police dispatchers and the actions the officers took in response, which we now proceed to detail.

at 0:12–0:19.[4]   The dispatcher stated that "the suspect vehicle"—described as "a black Camaro" carrying "two black males"—was believed to be "en route over" to the Lexington Avenue location.  *Id.* at 0:19–0:25.  Confirming these instructions, DiRienzo radioed back, "black Camaro, two black males, menacing with a handgun at the ShopRite."  *Id.* at 0:25–0:30.  A Westchester County dispatcher then immediately instructed County Police Officer Adam Wirth to assist DiRienzo, who was "heading over to 3469 Lexington Avenue for a menacing with a handgun," explaining that "wanted is a black Camaro [and] two black males."  Joint App'x, Disc Ex. 2D at 0:37–0:45.

When DiRienzo arrived at 3469 Lexington Avenue, he saw two State troopers speaking with a person whom he understood to be the 911 caller, but he observed no black Camaro at the scene.  At approximately 8:57 p.m., DiRienzo radioed that he was leaving 3469 Lexington Avenue and going to "canvass[] Route 6"—the main road between the Cortlandt ShopRite and 3469 Lexington Avenue, where the victim resided, a distance of approximately one mile—for "a black two-door Camaro."  Joint App'x, Disc Ex. 2E at 0:13–0:20.  At the suppression hearing, DiRienzo testified that he headed toward the ShopRite because that is where the reported menacing had occurred, and he knew from experience that radio miscommunications can occur when multiple locations are broadcast.  Meanwhile, Wirth, having heard DiRienzo's communication, reported by radio that he was already on Route 6.

---

[4] Police radio communications in Westchester County, whether originating with the New York State Police or the Westchester County Police Department, are audible to officers of both departments.

Minutes later, at approximately 9:01 p.m., a State trooper radioed an updated description of the suspect vehicle as a "black or possibly dark gray . . . Challenger or a Camaro." Joint App'x, Disc Ex. 2B at 0:05–0:12.[5] Although a State Police dispatcher repeated—with some modification—that the suspect vehicle was "a dark colored or dark gray Challenger or Camaro," *id.* at 0:18–0:22, DiRienzo radioed that he "copied" that the suspects were in "a dark gray or black Camaro or Challenger," Joint App'x, Disc Ex. 2G at 0:11–0:17, just as the reporting trooper had stated.

At that point, Officer Wirth reported that he was then "behind a black Camaro . . . going westbound" on Route 6. *Id.* at 0:22–0:30. At the suppression hearing, Wirth testified that he had first spotted the Camaro leaving the ShopRite parking lot and turning onto Route 6.[6] He testified that he rarely saw Camaros or Challengers on local roads during the winter and had seen no other such cars that night, when

---

[5] As the government notes, the Chevrolet Camaro and Dodge Challenger are "somewhat similar" looking cars. Appellant Br. at 4 n.2. And, as the district court observed, a black car might appear gray in winter as a result of road spray from materials put down to melt snow and minimize icing.

[6] Apparently, the Camaro had left and then returned to the ShopRite parking lot sometime after the reported menacing to retrieve a cell phone that Patterson had dropped in the ShopRite parking lot. Because the fact that the Camaro had left and returned to the ShopRite was unknown to any officers at the time of their challenged conduct on January 30, 2019, it does not factor into our consideration of this appeal.

7

roads were slick, snow was on the ground, and traffic was generally lighter than normal.[7]

Upon hearing Wirth's communication, DiRienzo promptly drove to his fellow officer's stated location and joined in following the Camaro. Unable to see inside the Camaro to determine the number or identity of the occupants, the officers, communicating by radio, decided to stop the vehicle. Seeing the Camaro's turn signal and brake lights illuminate near a Mobil gasoline station, Wirth turned on his vehicle's flashing emergency lights to signal the Camaro's driver—subsequently identified as defendant Patterson—to pull over. The driver did so, stopping at one of the station's gas pumps at approximately 9:02 p.m. The ensuing encounter was videotaped from various angles by police cameras and the Mobil station's security cameras.[8]

---

[7] At the suppression hearing, the government introduced evidence indicating that only 0.11%—approximately 1 in 1,000—of all cars registered in Westchester County are black or gray Camaros or Challengers. While the government does not contend that the officers were aware of this statistic at the time of the events at issue, it maintains that the statistic supports the officers' reported experience from their patrols. *Cf. Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (recognizing that "[e]mpirical studies [can] demonstrate what common experience readily reveals," there in context of drivers with revoked licenses operating motor vehicles).

[8] At the suppression hearing, DiRienzo testified that the stopped Camaro "[a]ppeared to be black, but I guess it was a dark gray." Joint App'x at 49. The district court also subsequently described the vehicle as "dark-colored, black or dark gray." *Id.* at 249. We cannot ourselves determine the car's color from the record evidence, but it makes no difference to our analysis on this appeal.

### III. Detention of the Camaro and Its Occupants at the Mobil Station

With the Camaro then stopped at a gas pump, Officer Wirth, Officer DiRienzo, and State Police Trooper Coglitore, who had also joined in following the Camaro, stopped their three vehicles—all now displaying flashing lights—a short distance behind the Camaro, effectively blocking the Route 6 entrance/exit point through which the vehicle had just entered the station. The Camaro's front-facing access to the station's Locust Avenue entrance/exit was unimpeded.

Almost immediately, the three officers exited their vehicles, drew their firearms—handguns for DiRienzo and Wirth, an AR-15 rifle for Coglitore—and pointed them at the Camaro.[9] At the suppression hearing, Wirth and DiRienzo testified that they drew and raised their weapons because the crime under investigation was menacing with a firearm, which by its nature presented a risk of the Camaro's occupants shooting an officer.

After brief consultation, Wirth and DiRienzo used their cars' public address systems to order the Camaro's still-unknown occupants to get out of the vehicle with their hands up. DiRienzo additionally told the occupants to roll down the car's windows and to

---

[9] In the videotape, it appears that DiRienzo and Coglitore pointed their weapons at the Camaro while Wirth held his gun at his side. Nevertheless, at the suppression hearing, Wirth testified that he "point[ed his] gun in the direction of the Camaro." Joint App'x at 132. Thus, we defer to the district court's finding that all three of these officers pointed their firearms at the Camaro.

9

place the car keys on the roof.[10] After the occupants failed to respond to any of these orders, Wirth—concerned that amplification might have distorted his order—shouted toward the Camaro for the occupants to exit the car with their hands up. DiRienzo testified that the driver of the Camaro (*i.e.*, Patterson), rather than follow these instructions, appeared to reach around the car's interior, including behind the front seats and under the steering wheel, as if preparing or hiding something, possibly a firearm.

Moments later—approximately one minute and fifteen seconds after the Camaro was first stopped at the gas station—the passenger-side occupant, a black man subsequently identified as Deshawn Smalls, exited the car. Seconds later, the Camaro's driver, Patterson, also a black man, did likewise. Initially, the two men followed the officers' instructions for Smalls to walk to the front of the vehicle and to place his hands on the car hood and for Patterson to walk to the rear of the vehicle and to place his hands on the trunk. At about this time, a second State trooper arrived at the scene, exited his vehicle, and also pointed his firearm at the Camaro.

While the two State troopers stood armed guard, DiRienzo and Wirth moved toward the Camaro. DiRienzo, who had now holstered his weapon, attempted to handcuff Patterson, but Patterson broke free and ran away. As DiRienzo and one of the troopers chased Patterson, DiRienzo thought he saw something in Patterson's hand. DiRienzo fired his taser but missed Patterson, who proceeded to jump

---

[10] The district court considered this direction somewhat inconsistent with the officers' orders to exit the car. For purposes of this appeal, we accept this characterization.

a fence and hide in nearby woods before being apprehended some fifteen minutes later.

While Patterson was on the run, Wirth holstered his firearm and handcuffed Smalls, at which point the State trooper who remained at the scene also holstered his weapon. Wirth then looked into the Camaro, opened the glove compartment, and seized therefrom the handgun that is the subject of the possession charge in this case: a fully loaded, black Makarov pistol.[11] Following Patterson's capture, Smalls and Patterson were formally arrested, and the Camaro was impounded by State Police who, pursuant to department procedures, conducted an inventory search of its contents.

## IV. District Court Proceedings

On April 2, 2019, a grand jury sitting in the Southern District of New York indicted Patterson on a single count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 2. On August 1, 2019, Patterson moved to suppress all physical evidence recovered from what he maintained was an illegal stop and search of the Camaro, most particularly the Makarov pistol that is the subject of the charged possession crime. On September 16 and October 1, 2019, the district court conducted a suppression hearing, at which

---

[11] A Makarov pistol is a semi-automatic weapon. *See Seeking Information – Thomas Crane Wales – Information on Makarov Pistol*, Fed. Bureau of Investigation, https://www.fbi.gov/wanted/seeking-info/thomas-crane-wales/walesweapon.pdf/view (last visited Feb. 3, 2022) (describing Makarov as "semi-automatic handgun," which "Soviet Bloc countries manufactured . . . through approximately 1968"); *see also, e.g.*, *United States v. Cerna*, No. 08-CR-730, 2010 WL 5387694, at *4 (N.D. Cal. Dec. 22, 2010) (describing Makarov pistol as semi-automatic weapon).

Officer Wirth, Officer DiRienzo, and State Investigator Peter Figiel, who conducted the inventory search of the Camaro, all testified, and at which various audio and video recordings of the events of January 30, 2019, were received in evidence.

In an oral ruling announced on October 30, 2019, the district court granted Patterson's motion to suppress. First considering whether the initial detention of the Camaro and its passengers was an investigatory stop or an arrest, the district court ruled the detention was, from the start, an arrest because of the degree of force used: "several officers with guns drawn, including an AR-15—and not just drawn, but pointed—and the police scream[ing] at the occupants to exit with hands up." Joint App'x at 257. The district court acknowledged that where "people [are] suspected of being armed," even investigatory stops may warrant some showing of force. *Id.* at 259. Nevertheless, viewing the question as "essentially one of degree," the district court concluded that "the conduct here exceeded that of a *Terry* stop" and was "indistinguishable from an arrest." *Id.*

The district court then observed that such a *de facto* arrest would be lawful only if supported by probable cause to think the occupants of the Camaro had been or were engaged in criminal activity. *See id.* It concluded that the officers lacked such probable cause when they first detained the Camaro. The district court observed that information then possessed by the officers—specifically, the similarity of the make, model, and color of the detained car to that reported by the menacing victim and relayed by dispatchers, as well as the car's sighting at or near the scene of the menacing shortly after the initial dispatch—might have provided the reasonable suspicion

12

necessary to support an investigatory stop, *see id.* at 260, but that such information was insufficient to establish the probable cause required for an arrest, *see id.* at 262.[12] The court explained that what the "officers had was the right kind of car in the general area within 10 minutes of dispatch," which was not "sufficient to warrant a person of reasonable caution in the belief" that the car's occupants "ha[d] committed the crime." *Id.* The district court observed that, for all the officers knew when they first detained the car, its occupants might have been "an innocent teenage girl or an elderly grandfather." *Id.* at 268. The court emphasized, however, that it did "not find any intent to violate defendant's constitutional rights on the part of the officers." *Id.* Rather, the officers "simply overdid it here given what information they had." *Id.*

Having thus identified an unlawful arrest, the district court concluded that any items seized from the Camaro, including the subject firearm, had to be suppressed as fruits of the illegal detention. Insofar as the government urged otherwise by arguing that Patterson abandoned the vehicle when he fled the scene or that the firearm would inevitably have been discovered during an inventory search of the Camaro, the district court rejected both arguments, finding

---

[12] Having found the detention of the Camaro and its occupants a *de facto* arrest, the district court never expressly ruled as to whether the officers' actions were supported by reasonable suspicion, stating only that reasonable suspicion was a "close question" that "might well come out in the government's favor." *Id.* at 260.

13

Patterson's flight and the Camaro's impoundment also to derive from the illegal arrest.[13]

Characterizing its suppression decision as "not an easy" one, the district court stated that it did not "discourage" the government from appealing its ruling. *Id.* at 269. Nevertheless, because suppression significantly weakened the government's case against Patterson, the district court ordered his release on bail. After the court memorialized its suppression ruling in a written order dated December 27, 2019, the government filed this appeal.

## DISCUSSION

On appeal of a grant of a motion to suppress evidence, we review the district court's findings of fact only for clear error, but we review its conclusions of law, as well as its resolution of mixed questions of law and fact, *de novo*. *See, e.g.*, *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018). Thus, among the questions warranting *de novo* review are those pertaining to whether the facts, as found by the district court, establish probable cause to support an arrest or reasonable suspicion to support an investigatory stop, as well as any force incident thereto. *See, e.g.*, *United States v. Fiseku*, 915 F.3d 863, 869 (2d Cir. 2018); *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018). Similarly, *de novo* review applies to the question of whether the facts, as found by the district court or as undisputed, establish probable cause to conduct a car search. *See Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[W]here there is no dispute as to

---

[13] Having so ruled, the district court did not consider whether the search was supported by probable cause to think the car contained evidence of a crime, a matter we discuss *infra* at 45–50.

14

what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."); *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) ("[T]he district court's ultimate determination of whether probable cause to search a vehicle existed is reviewed *de novo*.").

## I.     The Challenged Detention Was a Lawful Investigatory Stop, Not an Unlawful Arrest

The district court ruled that (1) from the moment on January 30, 2019, when police ordered a dark-colored Camaro to stop at a Mobil gas station, they effectively seized the car and its passengers, thereby triggering Fourth Amendment protections; (2) because of the degree of force used by police, the seizure was, from the outset, a *de facto* arrest and not simply an investigatory stop; and (3) the arrest was unlawful because it was not then supported by probable cause to think that the as-yet-unseen occupants of the Camaro had committed the gun-related menacing crime under investigation.    The government does not dispute that the Camaro and its passengers were effectively seized.  Nor does it argue that, at the outset—*i.e.*, before the Camaro's occupants exited the vehicle and thereby confirmed that they fit the description of the menacing suspects, before Patterson engaged in furtive actions inside the vehicle, and before he attempted to flee the scene—there was probable cause to arrest the Camaro's passengers.  Rather, in appealing the district court's suppression ruling, the government submits that the seizure was not an unlawful arrest but a lawful investigatory stop because (1) from the start, it was supported by reasonable suspicion of the Camaro's occupants' involvement in armed criminal activity, and (2) the degree of force used was reasonable in investigating a crime

15

involving the threatening use of a firearm.  We agree with both arguments.

## A. The Seizure Was Supported from the Start by Reasonable Suspicion of Criminal Activity

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend. IV.  While "reasonableness"—the "touchstone" of Fourth Amendment analysis, *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)—generally requires that law enforcement authorities procure a warrant supported by probable cause before seizing a person, neither a warrant nor probable cause is "indispensable" to reasonableness for every seizure. *National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).  As pertinent here, a brief investigatory stop may sometimes reasonably be conducted in the absence of a warrant and even of the probable cause required for a lawful arrest.  *See Terry v. Ohio*, 392 U.S. at 20; *United States v. Bailey*, 743 F.3d 322, 331–32 (2d Cir. 2014).  In explaining that conclusion in *Terry*, the Supreme Court observed that society's interest in "effective crime prevention and detection," as well as in officer and public safety while pursuing criminal investigations, can make it constitutionally reasonable "in appropriate circumstances and in an appropriate manner" both temporarily to detain a person and to pat him down for weapons, "even though there is no probable cause to make an arrest."  *Terry v. Ohio,* 392 U.S. at 22–23.  We focus first on whether the "circumstances" in this case made a *Terry* stop "appropriate."  *Id.*  In the next section of this opinion, we consider whether the "manner" in which the stop here was conducted was "appropriate."  *Id.*

16

For circumstances to warrant an investigatory stop, law enforcement officials must have a "reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" *United States v. Bailey*, 743 F.3d at 332 (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)); *see Terry v. Ohio*, 392 U.S. at 21–22. Like probable cause, reasonable suspicion is a "commonsense, nontechnical conception[] . . . 'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Unlike the "finely-tuned standards" for proof by a preponderance of the evidence or beyond a reasonable doubt, probable cause and reasonable suspicion are "fluid concepts," which "take their substantive content from the particular contexts in which the standards are being assessed." *Id.* at 696 (citation omitted). Thus, neither probable cause nor reasonable suspicion requires the more-likely-than-not showing demanded by the preponderance standard. *See Illinois v. Gates*, 462 U.S. at 235; *see generally United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) (defining preponderance standard as "more likely than not").

Moreover, reasonable suspicion demands even "less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187–88 (2020) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)) (explaining that reasonable suspicion can be established with information "different in quantity or content than that required to establish probable cause" (citation omitted)). Probable cause to arrest requires that the totality of facts and circumstances known to the police permit a person of reasonable caution to conclude that there is a "fair probability" that the person to be seized has committed or is

committing a crime. *Illinois v. Gates*, 462 U.S. at 238; *accord Walczyk v. Rio*, 496 F.3d at 156. By contrast, while reasonable suspicion requires more than a "hunch," *Terry v. Ohio*, 392 U.S. at 27, it is satisfied as long as authorities can point to "specific and articulable facts which, taken together with rational inferences from those facts," *id.* at 21, provide a "particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *accord United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (*en banc*). As this court and the Supreme Court have observed, the reasonable suspicion standard is "not high." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997); *United States v. Weaver*, 9 F.4th at 140. It does not require authorities to eliminate "all possible innocent explanations" for conduct before deeming it suspicious. *United States v. Bailey*, 743 F.3d at 333; *accord United States v. Weaver*, 9 F.4th at 140. Rather, authorities need only have "facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot.'" *United States v. Bailey*, 743 F.3d at 332 (quoting *Terry v. Ohio*, 392 U.S. at 30).

On this appeal, the parties sharply contest whether the information known to officers at the time of the Camaro's seizure on January 30, 2019, gave rise to reasonable suspicion of criminal activity by the vehicle's occupants. Because the district court concluded that the seizure was a *de facto* arrest requiring probable cause, it did not conclusively rule on the question of reasonable suspicion. While describing this question as "close," the court observed that it "might well come out in the government's favor." Joint App'x at 260. We do not think the question is close. Rather, we think the circumstances at the time of the seizure plainly supported reasonable suspicion to think that the as-then-unseen occupants of the detained Camaro were

18

the persons who "may have, and might still be, engaged in [the reported] criminal activity." *United States v. Bailey*, 743 F.3d at 332. This was sufficient to warrant stopping the Camaro to determine, in the first instance, whether its passengers fit the description of the reported assailants.

To explain, when police officers first detained the Camaro at the Mobil gas station, they knew from dispatch reports that,

1. a person had been menaced with a firearm;

2. the menacing had occurred in the parking lot of the ShopRite grocery store on Route 6 in Cortlandt;

3. the assailants were two black men;

4. at the time of the menacing, these men were driving a black or dark gray Camaro (or Challenger);

5. the men were possibly en route to 3469 Lexington Avenue in Cortlandt; and

6. the men were believed to be looking for a known individual at that location.

Further, from personal experience, the officers then knew that,

7. Chevrolet Camaros and Dodge Challengers are similar looking vehicles; and

8. these models of car were rarely seen on area roads.

Finally, from personal observations on the night of January 30, 2019, officers knew that,

9. within minutes of the dispatch reports, State troopers had spoken with the menacing victim at her 3469 Lexington Avenue home;

10. no Camaro or Challenger was seen or located at the 3469 Lexington Avenue complex;

11. approximately ten minutes after the initial radio dispatch, a county police officer reported seeing a black Camaro exiting the ShopRite parking lot that had been the scene of the reported menacing; and

12. it was not then possible for officers to see into the Camaro to identify the number, sex, or race of the passengers.

At the outset, we note that this evidence easily supported reasonable suspicion to think that an armed menacing crime had been committed and that its perpetrators were pursuing criminal activity against a named person. Indeed, such criminal activity was here reported by an identified victim, which provided not simply reasonable suspicion, but probable cause of commission. *See, e.g.,* *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." (internal citation omitted)). Nor is a different conclusion warranted because the 911 dispatcher's knowledge of the victim's firsthand report could not be imputed to the investigating officers. *See United States v. Colon*, 250 F.3d 130, 137–38 (2d Cir. 2001). State troopers' prompt confirmation of the report in an in-person interview of the victim was so imputable. *See id.* at 135. In sum, the reasonable suspicion of armed criminal activity here strongly

supported further investigation of persons who might have engaged in such activity and, as a result, might well be armed and dangerous. *Cf. Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) (citing "limited evidence that there was a crime" and "absence of any indication the plaintiffs were armed or dangerous" in finding stop a *de facto* arrest).

Patterson cannot urge otherwise by arguing that menacing is treated only as a misdemeanor offense under New York law. *See* N.Y. Penal Law § 120.14. That point does not alter the fact that menacing is criminally proscribed conduct. In any event, officers knew that the menacing in this case had been committed with a gun. Thus, however such potentially life-threatening conduct might be charged under New York law, the victim's firsthand report provided officers with probable cause to investigate specific, armed criminal activity.

What the victim could not provide, and what officers did not otherwise know when they first detained the Camaro at the Mobil gas station, was the identity of the persons who had committed the reported crime. Nevertheless, dispatch reports did provide them with the number, sex, and race of the assailants and their mode of transportation. Thus, officers knew to focus their investigation on two black men driving a black or dark gray Camaro or Challenger.

Further, officers knew that the menacing had occurred in the Cortlandt ShopRite parking lot and that the assailants were then possibly en route to a particular Lexington Avenue address—about a mile from the ShopRite—in search of an identified target. Within minutes of the first radio dispatch, Officer DiRienzo reported seeing no vehicle fitting the relevant description at the Lexington Avenue address. Minutes later, however, Officer Wirth reported seeing such

a vehicle—specifically, a black Camaro, matching both the dispatcher's initial description and the trooper's updated description—exit the ShopRite parking lot and enter onto Route 6. Because officers knew from experience that Camaros (and Challengers) were not commonly seen on local roads, particularly in winter, the spotting of a dark-colored Camaro at the scene of the menacing crime within ten minutes of the first dispatch report provided a reasonable basis (1) to suspect that its occupants "may have" been the persons who had committed the reported crime, *United States v. Bailey*, 743 F.3d at 332; and, thus, (2) to stop the vehicle to investigate whether its occupants did, in fact, match the suspects' reported description and whether they were armed and dangerous, *see id.* at 333 (concluding that while "many men" might fit drug dealer's description, it was fact that suspects "fit that description *and* had just left the very premises where [dealer] dealt drugs that provided an articulable basis . . . to suspect that [they were] involved in criminal activity" (emphasis in original)).[14]

To be sure, such an investigatory stop might have revealed that the Camaro's occupants did not fit the description of the suspected

---

[14] *United States v. Walker*, 965 F.3d 180 (2d Cir. 2020), cited by Patterson, is not to the contrary. There, we held that a photograph providing "little meaningful identifying information . . . besides [the suspect's] race" did not provide reasonable suspicion for a *Terry* stop of the black defendant, two days after a crime's commission and at a location "near the crime scene" but otherwise unrelated to the investigation. *Id.* at 183, 186–87. By contrast, the vehicle identification here was meaningful, not only because officers rarely observed Camaros on Westchester roads, especially during the winter, but also because the stopped Camaro was spotted by police leaving the scene of the reported menacing crime only minutes after the first dispatch and after an officer had confirmed that no such vehicle was present at the complex where the victim resided.

assailants—*e.g.,* they might have been the teenage girl or grandfather hypothesized by the district court. *See* Joint App'x at 268. But even if the possibility of innocent occupants precluded finding probable cause to arrest the Camaro's occupants before they exited the vehicle, as the district court ruled, it did not preclude officers from having a reasonable suspicion to stop the vehicle to investigate its occupants. Just as reasonable suspicion does not require officers to eliminate "all possible innocent explanations" for particular circumstances in order to conclude that persons "may have" or "might still be . . . engaged in criminal activity," *id.* at 332–33, it does not require officers to assume an innocent explanation where a suspicious one is reasonably supported by specific, articulable facts. Indeed, the very purpose of a *Terry* stop is to "confirm *or dispel* the reasonable suspicion that justifies the stop in the first place." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) (emphasis added).

The conclusion that reasonable suspicion supported the vehicle stop in this case finds support in our own precedent and that of sister circuits. In *United States v. Bold,* in which the model and location of a vehicle spotted by police matched an anonymous tip reporting armed criminal activity, this court found reasonable suspicion supported a stop of the vehicle to investigate as-yet-unseen occupants. 19 F.3d 99, 103 (2d Cir. 1994).[15] Similarly, in *United States v. Roberts*, the Eighth Circuit identified reasonable suspicion to stop a "black Chrysler" spotted in the vicinity of a shooting location because it matched the

---

[15] Indeed, a finding of reasonable suspicion is stronger here because the vehicle description and crime location came not from an anonymous tipster but from the identified crime victim herself. *See supra* at 20.

description of the shooter's vehicle. 787 F.3d 1204, 1209–10 (8th Cir. 2015); *see also United States v. Burgess*, 759 F.3d 708, 711 (7th Cir. 2014) (holding reasonable suspicion supported stop of vehicle matching reported "black car" involved in criminal activity near certain location because "officers had both a specific car color and a street location to zero in on"); *United States v. McCarthy*, 77 F.3d 522, 530 n.8 (1st Cir. 1996) (identifying reasonable suspicion to stop vehicle matching suspect's reported "red Pontiac Sunbird" in area of alleged crime).

In urging otherwise, Patterson argues that, "[i]n those cases, not only did the description of the suspect's car . . . match the defendant's car, but its location was also consistent with the likely location of the suspect's car given the timing and the location of its last sighting." Appellee Br. at 49 n.12. Patterson submits that the "likely location" of the car here at issue was not the ShopRite parking lot, only one mile from the Lexington Avenue address. Rather, he contends that the car was likely some greater distance east or west of 3469 Lexington Avenue, given that the victim had reported seeing the car there at approximately 8:52 p.m., *see supra* at 5 & n.3, and DiRienzo effectively confirmed the car's departure some ten minutes later. Even accepting Patterson's characterization of the victim's call, the argument fails to persuade because the officers had not heard it. They knew only what the dispatchers told them, which was that the vehicle used in the menacing was "possibly en route" to the Lexington Avenue address. Joint App'x, Disc Ex. 2A at 0:20–0:24. Thus, when, minutes after hearing the dispatch report, DiRienzo went to that address and advised that he saw no vehicle fitting the reported description, that was all the investigating officers knew. They did not "kn[o]w" that

24

the car had "left" that address within the prior few minutes. Appellee Br. at 48. In any event, within moments of DiRienzo's report, Wirth stated that he was following a black Camaro on Route 6. As Wirth later testified, Camaros were infrequently seen on area roads, and he had just seen this particular Camaro exiting the ShopRite parking lot, *i.e.*, the scene of the menacing crime. In the totality of these circumstances, the sighting of a dark-colored Camaro exiting the ShopRite parking lot soon after officers became aware of the reported armed menacing crime provided a reasonable basis to suspect that the car and its occupants may have been involved in that crime so as to warrant an investigatory stop.

In challenging such a conclusion, Patterson argues that, when police stopped the Camaro, they did not know how much time had passed between the reported menacing and the dispatch announcements they heard. In fact, circumstances made it reasonable for the officers to infer that the menacing had recently occurred. First, the very nature of the crime—threatening a person with a gun—is one that a victim would likely report promptly. *See generally Kansas v. Glover*, 140 S. Ct. at 1190 (stating that officers "may rely on probabilities in the reasonable suspicion context"). Second, officers were told that the two suspects were then "possibly en route" to a specific location in search of an identified person. Joint App'x, Disc Ex. 2A at 0:20–0:24, 0:39–0:42. This admitted a reasonable inference not only that a menacing had recently occurred but also that criminal activity against a sought person was then being pursued. The prospect of an ongoing threat to an identified individual, known to the menacing victim, further bolstered the inference that the victim had reported the crime promptly after its commission. Third, almost

25

simultaneous dispatch requests for investigation by State and county police officers suggested an urgency consistent with recent criminal activity. In these circumstances, no reasonable police officer would have had reason to think that the reported information was stale, much less to doubt that prompt investigation of a dark-colored Camaro seen leaving the scene of the menacing crime a short while after the first dispatch report was warranted.

Nor is that conclusion undermined by the further fact, emphasized by Patterson, that on leaving the ShopRite parking lot, the Camaro traveled in a direction away from, rather than toward, the reported Lexington Avenue location. The travel direction admits any number of inferences, some innocent, some not. While it was possible that the Camaro's occupants were not heading toward Lexington Avenue because they were not the menacing perpetrators, it was also possible that they were the perpetrators but, being unfamiliar with the area, had entered the highway in the wrong direction. Or it was possible that they were first going to meet with an accomplice or to stop at a convenient nearby gas station, or that they had decided not to pursue their second target that evening. No matter. Reasonable suspicion does not require officers to disprove every innocent possibility before investigating suspicious circumstances. *See United States v. Weaver*, 9 F.4th at 140; *United States v. Bailey*, 743 F.3d at 333.

Thus, we conclude as a matter of law that the totality of circumstances known to the officers on January 30, 2019, provided them with an articulable, reasonable basis to suspect that the Camaro seen leaving the scene of a recent armed crime was the vehicle reportedly driven by the persons engaged in recent and ongoing

26

criminal activity. And that reasonable suspicion was sufficient to support a *Terry* stop to investigate the vehicle's occupants' connection with the reported criminal activity.

### B. The Manner in Which the Stop Was Conducted—Specifically the Force Used—Was Reasonable to the Crime Under Investigation

At the heart of this appeal is the district court's determination that the degree of force used in seizing the Camaro at the Mobil station "overdid" what was appropriate for a *Terry* stop and, therefore, was "indistinguishable from an arrest." Joint App'x at 259, 268. For reasons we proceed to explain, we conclude that the force used in this case—while undoubtedly strong—was reasonable to the armed crime under investigation and appropriate at least until such time as law enforcement authorities could determine whether the Camaro's occupants fit the description of the menacing assailants and, if they did, could take measures to ensure that the men could not employ a firearm reasonably suspected to be in their possession.

For an investigatory stop to be conducted in an "appropriate manner," *Terry v. Ohio,* 392 U.S. at 22, the stop must be "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place," *Grice v. McVeigh,* 873 F.3d at 167; *see also United States v. Perea,* 986 F.2d 633, 644 (2d Cir. 1993) (stating that permissible *Terry* stop may ripen into *de facto* arrest requiring probable cause if officers "unreasonably used means of detention that were more intrusive than necessary" for stop). Factors generally relevant to that inquiry include the following:

(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Fiseku*, 915 F.3d at 870 (citation omitted); *see also Grice v. McVeigh*, 873 F.3d at 167 (identifying relevant factors as, "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used" (internal citations omitted)).

The duration of the stop does not here support finding a *de facto* arrest. Little more than one minute after stopping the Camaro, officers were able to confirm that the number (two), sex (male), and race (black) of the vehicle's occupants matched the reported description of the menacing perpetrators. That fact, together with the color and model of the car and its sighting moments earlier at the menacing crime scene, provided reasonable suspicion further to investigate whether the occupants were involved in the reported armed criminal activity. Within approximately two minutes of the initial stop, Patterson fled, and within approximately five minutes, officers confirmed the occupants' possession of a firearm when they located and seized the loaded Makarov pistol from the Camaro's glove compartment. An investigatory stop of this duration plainly

28

falls within the bounds this court has deemed reasonable. *See, e.g.*, *Grice v. McVeigh*, 873 F.3d at 168 (upholding thirty-three minute detention as reasonable stop); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) ("We decline to hold that a thirty minute detention based on reasonable suspicion is, *per se*, too long.").

But for a stop to be conducted in an appropriate manner, not only must it be no longer in duration than necessary to confirm or dispel officers' reasonable suspicions; the stop must also employ "'the least intrusive means reasonably available' to effect . . . legitimate investigative purposes." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)); *accord United States v. Fiseku*, 915 F.3d at 870. The pertinent question in undertaking that assessment, however, "is not simply whether some other alternative was available" to authorities as a means for conducting the stop. *United States v. Sharpe*, 470 U.S. 675, 687 (1985). As the Supreme Court has recognized, "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Id.* at 686–87. Rather, a court must consider whether "police acted unreasonably in failing to recognize [a less intrusive alternative] or to pursue it." *Id.* at 687. This standard affords "room for a range of reasonable police responses depending on the circumstances." *United States v. Weaver*, 9 F.4th at 140. Indeed, this principle applies most particularly when police confront an evolving and volatile situation. *See United States v. Sharpe*, 470 U.S. at 686 (instructing that courts assessing reasonableness of investigatory stop "should take care to consider whether the police are acting in a swiftly developing situation"); *United States v. Weaver*, 9 F.4th at 140–

29

41; *cf. Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (stating, in excessive force context, that "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving").

Such a situation may arise when circumstances provide a "reasonable basis" for an officer "to think that the person stopped poses a present physical threat to the officer or others." *United States v. Newton*, 369 F.3d at 674. Then, "the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *Id.* (quoting *Terry v. Ohio*, 392 U.S. at 24). As the Supreme Court explained in *Terry*, when circumstances warranting an investigative stop pose a risk of danger, the court's concern is

> with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

30

*Terry v. Ohio*, 392 U.S. at 23–24.[16]

This reasoning has informed numerous federal court decisions upholding "a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms, to the use of handcuffs." *United States v. Newton*, 369 F.3d at 674 (internal citations omitted) (collecting cases across circuits).[17]  Indeed, such measures have been

---

[16] The harsh realities recognized in the last two quoted sentences remain an issue a half-century later.  The FBI reports that, in 2021, 73 officers were feloniously killed in the line of duty, "a 58.7 percent increase compared to the 46 officers killed in 2020 and the highest total since 2011"; 61 of those deaths were firearm-related, an increase from the 41 firearm-related deaths in 2020.  *See Law Enforcement Officer Deaths: 01/01/2021–12/31/2021*, Fed. Bureau of Investigation (Jan. 1, 2022), https://s3-us-gov-west-1.amazonaws.com/cg-d4b776d0-d898-4153-90c8-8336f86bdfec/LEOKA_INFO.pdf.

[17] A trio of cases cited by the district court in which such restraint measures were found to manifest arrest are not analogous.  In *United States v. Ceballos*, officers conducting a stop drew their guns without a reasonable basis to suspect that the detained individual was armed and dangerous.  654 F.2d 177, 183–84 (2d Cir. 1981).  But as the Eighth Circuit correctly recognized, *Ceballos* "does not establish a per se rule that a display of weapons, even combined with blocking, transforms a stop into an arrest." *United States v. Jones*, 759 F.2d 633, 639 (8th Cir. 1985).  What rendered the force in *Ceballos* unreasonable for an investigatory stop was the officers' inability to articulate "facts which they had viewed as creating the need for a greater show of force than usually associated with a *Terry* stop." *Id.*  By contrast, here, the victim's report of a recent armed crime provided officers with a factual basis to suspect that the car's occupants were armed and dangerous.

In *United States v. Levy*, the issue was whether a search occurred before or after an arrest, for which the defendant conceded probable cause.  731 F.2d 997, 1000 (2d Cir. 1984).  Against this backdrop, this court held that a district court's finding that that the stop—in which a DEA agent drew his weapon, showed his badge, ordered the detainee to freeze, and forced the detainee to "stand spread-eagle against a wall"—constituted an arrest before the "formal words of arrest" had been spoken was "not clearly erroneous." *Id.* at 1000–01. Finally, in *United States v. Moreno*, the government conceded that the circumstances constituted an arrest—requiring a

found reasonable "not 'to discover evidence of crime,' but to help law enforcement ascertain whether a suspect has a weapon 'which might be used to harm the officer or others nearby.'" *United States v. Weaver*, 9 F.4th at 140 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). To be sure, these precedents do not categorically approve the use of forceful restraints in every investigatory stop. We have continued to stress that handcuffing and drawing weapons remain "hallmark[s] of a formal arrest," not a *Terry* stop. *United States v. Bailey*, 743 F.3d at 340 (citation omitted); *see also United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (noting that "[u]nder ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop" (alteration in original) (citation omitted)). Thus, to conclude that the use of such intrusive measures incident to an investigatory stop did not transform the stop into an arrest requires a court's "careful consideration of the circumstances." *United States v. Bailey*, 743 F.3d at 339–40. *Compare, e.g., id.* at 340–41 (holding handcuffing incident to investigatory stop not reasonable where detainees had been removed from car and pat down demonstrated them to be unarmed), *with United States v. Newton*, 369 F.3d at 675 (holding it reasonable during investigatory stop to handcuff detainee, who had threatened to kill mother, until gun believed to be on premises was located and secured).

---

showing of probable cause—and not merely a frisk. 897 F.2d 26, 31 (2d Cir. 1990), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). Thus, in neither *Levy* nor *Moreno* did the government attempt to demonstrate reasonable suspicion that the detainee was armed and dangerous so as to justify a heightened use of force during an investigatory stop.

In applying these principles here, we are mindful that when police ordered the Camaro to stop at the Mobil gas station, they were investigating a report of menacing with a gun by persons still looking for an identified target. The very nature of that criminal activity provided officers with an articulable, reasonable basis to suspect that the Camaro's occupants might be armed and dangerous. This court has repeatedly acknowledged that certain crimes, notably drug trafficking, present a sufficient risk of violence to give rise generally to a "genuine need of law enforcement agents to protect themselves from the deadly threat [such crimes] may pose." *United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990). Even if no such conclusion categorically applies to menacing as proscribed by New York law, it does apply here, where the particular menacing crime under investigation was reported to have been committed with a gun. *See United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) (stating that officer's belief "that the suspect may be armed and dangerous can be predicated on the nature of the criminal activity involved"). In these circumstances, which support reasonable suspicion to think the menacing assailants were armed and not hesitant to use firearms in their possession, it was entirely appropriate for officers, in conducting an investigatory stop of the Camaro, to take reasonable measures to protect themselves and bystanders while they ascertained whether the vehicle's occupants fit the reported description of the armed assailants and ensured that the occupants could not use any firearm to cause harm.

The genuine need for such protection at the outset of the stop was only reinforced by the fact that the persons to be investigated were still inside the Camaro. As this court and the Supreme Court

33

have recognized, vehicle stops, particularly those investigating criminal activity, are "especially fraught with danger," both for police officers and individuals. *United States v. Weaver*, 9 F.4th at 143 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). That danger is often best "minimized if the officers exercise unquestioned command of the situation." *Id.* (internal alterations and citation omitted); *see also United States v. Alexander*, 907 F.2d at 273 (citing *Michigan v. Long*, 463 U.S. at 1047–49) (recognizing car stops as "especially hazardous and support[ing] the need for added safeguards").

The police measures taken here to exercise unquestioned command of a situation in which potentially armed suspects were still inside a stopped vehicle included: (1) having three (and eventually four) officers at the scene; (2) blocking the vehicle's rear exit from the gas station; (3) using a loudspeaker or shouted voice to order suspects to exit the vehicle; and (4) pointing police firearms, including an AR-15 semi-automatic rifle, at the stopped vehicle. In the circumstances here, we easily conclude that the first three measures, considered collectively, were not so excessive as to convert the challenged stop into a *de facto* arrest.

First, having police officers outnumber suspects—here only modestly—is a reasonable protective measure when conducting an investigatory stop, particularly of persons reasonably suspected to be armed and dangerous. *See United States v. Newton,* 369 F.3d at 675 (rejecting argument that involvement of six officers in *Terry* stop of single suspect threatening to kill mother manifested *de facto* arrest); *United States v. Garcia,* 339 F.3d 116, 119 (2d Cir. 2003) (same in case in which ten officers (as found by district court) participated in *Terry*

stop of two suspects); *United States v. Alexander*, 907 F.2d at 272–73 (same in case in which three officers participated in *Terry* stop of two suspects in vehicle).

Second, while completely blocking in a suspect vehicle can contribute to a finding of *de facto* arrest, *see United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982); *United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir. 1981), such action is not necessarily determinative, *see United States v. Perea*, 986 F.2d at 644 (stating that use of police vehicles to impede mobility of suspect's car "does not necessarily mean that, instead of a *Terry* stop, there was a *de facto* arrest"); *see also, e.g.*, *United States v. Garcia*, 339 F.3d at 119.[18]  Importantly, here, police did not completely block the Camaro; the officers' vehicles were all parked behind the Camaro and, thus, did not obstruct the Mobil station's Locust Avenue entrance/exit, which the Camaro could have accessed

---

[18]  In any event, when in *Marin*, this court found a *de facto* arrest where law enforcement officers completely boxed in a car and, at gunpoint, pulled occupants out of the vehicle, we there identified no factual basis to suspect that these persons were armed and dangerous.  *United States v. Marin*, 669 F.2d at 81–82.  This case is not analogous because, here, police had a reasonable basis to think the Camaro occupants were armed and dangerous.  Moreover, officers did not completely box in the suspects' car, and they pointed police weapons from a distance while ordering the car's occupants to exit under their own power.

In *Ceballos*, this court observed that the mobility of a motor vehicle did not justify the tactics used because the suspect could have been stopped on the street before he entered his car.  *See United States v. Ceballos*, 654 F.2d at 184; *see also United States v. Jones*, 759 F.2d at 639 (distinguishing *Ceballos*, in which "[t]he police tactics could not be grounded in the dangers of approaching an automobile when it appeared that the suspect could have been stopped on the street before he entered his car").  No similar conclusion obtains here because when police first spotted the Camaro, the car and its occupants were already mobile.  Moreover, reports indicated that the suspects might have been en route to locating a potential victim, circumstances making it reasonable promptly to stop the Camaro.

35

simply by driving forward. *See United States v. Nargi*, 732 F.2d 1102, 1107 (2d Cir. 1984) (distinguishing *Marin* and *Ceballos*, in which officers blocked suspect's car in front and rear, "preventing any movement").

Third, the use of loudspeakers and then a shouted voice to direct the Camaro's occupants to exit the vehicle with their hands up might well have been intimidating to the average person, powerfully signaling no simple request but, rather, an unqualified order. Nevertheless, the use of such high-volume means was a reasonable protective action because it allowed officers to maintain some distance between themselves and persons, still inside a vehicle, reasonably suspected of being armed and dangerous. In such circumstances, we cannot conclude that a lower-volume alternative— such as going up to the Camaro, tapping on the window, and, in a regular speaking voice, asking potentially armed occupants to exit— was a viable alternative that police officers should have recognized and employed to conduct a lawful investigatory stop under the Fourth Amendment.[19]

But these three actions were hardly the only force used. They must be considered together with a fourth, and most forceful, action taken by police from the inception of the Camaro's detention: pointing firearms at the vehicle. Like handcuffing, such a display of deadly force is usually associated with an arrest. *See United States v.*

---

[19] Circumstances may bear differently in the Fifth Amendment context than in the Fourth Amendment context. *See United States v. Newton*, 369 F.3d at 673–75 (explaining that Fifth Amendment custody determination considers how circumstances appear to person being restrained while Fourth Amendment reasonableness determination considers how circumstances appear to officer).

*Vargas*, 369 F.3d at 102. Nevertheless, as this court has long recognized, a police display of firearms does not invariably denote arrest. *See, e.g.*, *United States v. Garcia*, 339 F.3d at 119 ("We have previously rejected the argument that a *Terry* stop necessarily becomes an arrest if the police 'used their cars to block [defendant's] vehicle' and 'approached [the] stopped car with guns drawn in order to protect themselves and bystanders.'" (alterations in original) (quoting *United States v. Perea*, 986 F.2d at 644)); *United States v. Nargi*, 732 F.2d at 1106 ("A display of guns by the police, however, does not automatically convert a stop into an arrest."); *United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982) (holding officer not "precluded from displaying a weapon unless he has probable cause to make an arrest" and that "[i]t would be a sad day for law enforcement officers if a per se rule to the contrary were now adopted"). Such force can be a reasonable protective measure for an investigatory stop when there is a basis for thinking that suspects are armed and dangerous.[20] This is such a case.

To explain, we must reiterate observations already made. Officers stopped the Camaro because it fit the description of the vehicle used during a recent armed crime and had just been spotted

---

[20] Our sister circuits have similarly so ruled. *See, e.g.*, *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987); *United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010); *United States v. Bull*, 565 F.2d 869, 870 (4th Cir. 1977); *United States v. Maslanka*, 501 F.2d 208, 213 & n.10 (5th Cir. 1974); *United States v. Lane*, 909 F.2d 895, 899 (6th Cir. 1990); *United States v. Chaidez*, 919 F.2d 1193, 1198–99 (7th Cir. 1990); *United States v. Jones*, 759 F.2d at 640–41 [8th Cir.]; *United States v. Greene*, 783 F.2d 1364, 1367–68 (9th Cir. 1986); *United States v. Merritt*, 695 F.2d 1263, 1272–74 (10th Cir. 1982); *United States v. Roper*, 702 F.2d 984, 987–88 (11th Cir. 1983); *United States v. White*, 648 F.2d 29, 34–35 (D.C. Cir. 1981).

leaving the scene of that crime. The purpose of the stop was to determine whether the vehicle's as-yet-unseen occupants fit the description of the crime's perpetrators and, if they did, to investigate further their possible involvement in that crime. Given that the crime under investigation involved the use of a firearm, such an inquiry was necessarily fraught with danger for investigating officers. Moreover, the danger was compounded because, at the inception of the stop, occupants were still inside the vehicle and, thus, could not readily be prevented from accessing or using the firearm then reasonably suspected to be in their possession. In these circumstances, safe pursuit of the investigation prompting the stop permitted officers, first, to have the occupants exit the vehicle and, then, if they fit the description of the menacing assailants, to take appropriate further measures to ensure that they could not access any weapons.

While ordering occupants out of a vehicle can be a "reasonable step[] to ensure safety" during a lawful stop, *United States v. Weaver*, 9 F.4th at 143, the process itself may pose a risk of danger to the officers where, as here, occupants were reasonably suspected of being in possession of a gun, which they could have fired at officers as they exited the Camaro, *see Terry v. Ohio*, 392 U.S. at 23–24 (acknowledging frequency with which armed criminals kill or wound police officers in line of duty); *see also supra* n.16. A reasonable suspicion that the Camaro's occupants might do so here was heightened by the assailants' reported willingness to use a gun during the menacing crime. Further heightening that suspicion was the occupants' delay in responding to police directions to exit or put their hands outside the vehicle while officers observed Patterson appear to reach for something in the car. A police officer is not required to assume that

such furtive action had an innocent explanation, *see United States v. Weaver*, 9 F.4th at 140, nor is he required to assume that a suspect willing to brandish a weapon would hesitate to fire it.  As this court has observed, the law does not "impose on law enforcement personnel the [H]obson's choice of keeping their guns holstered when to do so increases the risk that they will be shot."  *United States v. Harley*, 682 F.2d at 402 (internal alterations and quotation marks omitted).  Thus, to "exercise unquestioned command" of such a volatile situation, *United States v. Weaver*, 9 F.4th at 143 (citation omitted), it was reasonable for officers to position themselves and their own firearms so as both to dissuade occupants from using any firearms in their possession and to allow officers promptly to respond, if necessary, to any life-threatening action by the car's occupants as they exited the vehicle.  Aiming their weapons at the Camaro was a reasonable way to ensure readiness to "neutralize the threat of harm if it materialized."  *Terry v. Ohio*, 392 U.S. at 30; *accord United States v. Newton*, 369 F.3d at 674 (quoting this language from *Terry* in recognizing range of restraints, including "drawing of firearms," as permissible to neutralize threat "without converting a reasonable stop into a *de facto* arrest"); *United States v. Alexander*, 907 F.2d at 273 (holding it reasonable for officers conducting *Terry* stop to unholster firearms when conducting investigatory stop of persons suspected of recent drug transaction).

Moreover, it does not appear that the officers unreasonably failed to recognize and employ less forceful, but equally effective, alternative means of protecting themselves and bystanders at the initiation of the detention.  *See United States v. Sharpe*, 470 U.S. at 687–88.  The district court did not identify such an alternative, and

Patterson fails to prescribe one even on appeal. *Cf. United States v. Gori*, 230 F.3d 44, 55 (2d Cir. 2000) (observing, in rejecting *Terry* stop challenge, that dissenter "fail[ed] to prescribe what the police should have done within the proper parameters of the Constitution"). Oral commands—even at high volume—would not provide such protection, particularly where, as here, oral exit commands went ignored for approximately one minute, during which time one officer saw the Camaro's driver (Patterson) handling something in the car that could have been a gun. And, of course, until occupants exited the vehicle, there was no possibility of police safely frisking them to ensure that they were unarmed, much less of handcuffing them. Nor would it have been reasonable for officers to have followed the Camaro and waited until its occupants exited the vehicle of their own volition before initiating an investigatory stop. Facts known to the officers supported a reasonable belief that the Camaro's occupants posed an ongoing, armed threat to a known individual, which warranted swift intervening action by police. In any event, wherever officers initiated an investigatory stop, because the occupants fit the description of the menacing assailants, police would have had heightened reason to suspect that they were armed and dangerous.

Thus, when the occupants exited the vehicle at the Mobil station, police suspicions that they might be armed and dangerous were reinforced.[21] At that point, frisking might have ensured that the two men had no guns on their persons, *see United States v. Bailey*, 743

---

[21] Had the vehicle's occupants not fit the description of the menacing assailants, *e.g.*, had they been the teenager or grandfather hypothesized by the district court, *see* Joint App'x at 268, there would no longer have been reasonable suspicion for the stop, much less for officers to use forceful means to conduct it.

F.3d at 340 (holding that once frisk revealed suspected drug trafficker unarmed, handcuffing was unnecessary to conduct stop safely and, thus, transformed detention into arrest), and handcuffing might have prevented them gaining access to the as-yet-unlocated handgun reasonably—and it turned out, correctly—suspected still to be in their possession, *see United States v. Newton*, 369 F.3d at 675 (holding handcuffing while police searched for firearm thought to be on premises less intimidating and dangerous than holding suspect at gunpoint). But to take either of these actions, officers had to walk from their own vehicles to the Camaro, exposing themselves, even if only briefly, to the risk of being shot. In these circumstances, it was reasonable for State troopers standing several feet away to keep their weapons aimed at the Camaro and its occupants at least until their fellow officers—who had lowered, then holstered their own handguns—safely reached the Camaro and secured its occupants.[22] Here, however, officers were not then able to secure Patterson because, undeterred by the troopers' aimed weapons, he fled the scene. Thus, with officers unable to frisk or cuff Patterson, reasonable suspicion to think that he was armed and dangerous continued through his apprehension and arrest, particularly as DiRienzo testified that Patterson appeared to have had something in his hand as he fled.

To the extent Patterson suggests that the officers crossed the line from stop to arrest by pointing rather than simply unholstering

---

[22] As noted *supra* at 11, after Officer DiRienzo and one State trooper chased Patterson, the State trooper remaining at the scene with Officer Wirth did, in fact, secure his weapon as soon as Wirth successfully handcuffed Smalls.

or otherwise displaying their guns, we are not persuaded. For unholstering or otherwise displaying a firearm to be a reasonable protective measure in the execution of an investigatory stop, the suspected risk of danger must already be significant, if not life-threatening. Thus, in cases of such danger, this court appears, to date, not to have drawn any categorical, bright lines distinguishing among unholstering, displaying, and pointing a firearm.[23] For example, in *United States v. Garcia,* when we affirmed a district court ruling that a *Terry* stop was not transformed into a *de facto* arrest by officers having their "guns drawn *and aimed,*" No. 01-CR-35, 2001 WL 1297791, at *6 (S.D.N.Y. Oct. 25, 2001) (emphasis added), we stated simply that the officers "drew their guns," making no mention of the finding that they were aimed, 339 F.3d at 119. *See also, e.g.*, *United States v. Perea*, 986 F.2d at 636, 644–45 (concluding that *Terry* stop was not *de facto* arrest at inception merely because officers "approached a stopped car with guns drawn," where court noted defendant's testimony that officer "pointed a revolver at him"). *But see United States v. Jackson*, 652 F.2d 244, 249 (2d Cir. 1981) (upholding as reasonable investigatory stop in which officer drew weapon, noting that nothing in record indicates he "ever pointed it" at suspect).[24]

---

[23] Indeed, hindsight efforts to distinguish between a drawn gun and a pointed one could invite litigation by protractor, with parties disputing whether a gun was held at a sufficiently downward angle to qualify as "drawn" or raised sufficiently to qualify as "pointed."

[24] For several decades, circuit courts have upheld as reasonable *Terry* stops during which police pointed guns at persons reasonably suspected of being armed and dangerous. *See, e.g.*, *Foote v. Dunagan*, 33 F.3d 445, 447–48 (4th Cir. 1994); *United States v. Sanders*, 994 F.2d 200, 204–05 (5th Cir. 1993); *Houston v. Clark Cnty. Sheriff*

We do not foreclose the possibility that, in certain circumstances, whether a police firearm was drawn or pointed may inform the reasonableness of a stop. But the critical question remains the same: Can the officer "point to specific and articulable facts which, taken together with rational inferences from those facts, . . . warrant a man of reasonable caution in the belief that" the officer's conduct in "neutraliz[ing] the threat of physical harm" was appropriate based on "the facts available to the officer at the moment of the seizure"? *Terry v. Ohio*, 392 U.S. at 21–22, 24 (internal quotation marks omitted). Here, the fact that the crime under investigation had been committed with a gun supported officers' reasonable suspicion to think the Camaro's occupants—reasonably suspected of being the crime's perpetrators—might be armed and dangerous. This suspicion warranted initially aiming firearms at the vehicle to safeguard officers

---

*Deputy John Does 1–5*, 174 F.3d 809, 812, 814–15 (6th Cir. 1999); *United States v. Serna-Barreto*, 842 F.2d 965, 967–68 (7th Cir. 1988); *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987); *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983); *United States v. Merritt*, 695 F.2d at 1272–74 [10th Cir.]; *Courson v. McMillian*, 939 F.2d 1479, 1492–93 (11th Cir. 1991); *United States v. Clark*, 24 F.3d 299, 303–04 (D.C. Cir. 1994). We note that *Clark* postdates the D.C. Circuit's decision in *United States v. White*, in which the court stated that a "reasonable person would indeed distinguish between the implications of policemen approaching with guns at their side and policemen approaching with guns leveled at the subjects." 648 F.2d at 34 n.27. As we stated *supra* n.19, a reasonable person's perception may well bear on custody inquiries under the Fifth Amendment.

Other courts have deemed *Terry* stops conducted at "gunpoint" reasonable without specifying whether officers' guns were drawn or actually aimed at suspects. *See, e.g.*, *United States v. Pontoo*, 666 F.3d 20, 30–31 (1st Cir. 2011) (noting that "*Terry* stop appropriately may involve . . . effecting a stop at gunpoint"); *United States v. Torres*, 961 F.3d 618, 623 (3d Cir.) (highlighting absence of "per se rule that pointing guns at people . . . constitutes an arrest" (citation omitted)), *cert. denied*, 141 S. Ct. 936 (2020).

and bystanders while occupants exited. Moreover, officers' suspicion would reasonably have increased as the occupants failed promptly to obey police exit orders; engaged in furtive behavior in the car; and, on exiting, confirmed that they fit the description of the sought menacing assailants. In these circumstances, it was reasonable for officers to frisk and handcuff the occupants to ensure that they could not access the firearm reasonably thought to be in their possession. That endeavor, however, was itself sufficiently fraught with danger to preclude a court from holding it unreasonable for other officers to continue to cover their colleagues with pointed firearms rather than with guns only displayed.

Nor is a different conclusion warranted because one of the guns so aimed was an AR-15 rifle. This court has previously upheld as reasonable incident to a *Terry* stop police use of weapons of similar caliber to the AR-15. *See United States v. Nargi*, 732 F.2d at 1106–07 (deeming police use of shotgun reasonable during *Terry* stop).

In sum, we conclude that, in the circumstances of this case, the high degree of force used by police in detaining a Camaro and its occupants on January 30, 2019, was reasonable for purposes of safely conducting an investigatory stop—at least until the occupants exited the vehicle, were seen to fit the description of the sought armed assailants, and were appropriately restrained to prevent them from accessing any weapons. Thus, the use of force in this case did not transform that stop into an unlawful *de facto* arrest warranting suppression of evidence seized from the Camaro, including a loaded Makarov pistol.

44

## II. The Search of the Camaro Was Otherwise Lawful

Having concluded that the evidence seized in this case was not the fruit of an unlawful arrest, we consider whether suppression was nevertheless warranted on other grounds, specifically, a lack of probable cause to support a search of the vehicle's interior. The district court did not consider this question. Although we generally refrain from addressing issues not decided in the first instance by the district court, this rule is prudential, and we have broad discretion to consider issues that were briefed and argued in the district court, even if not decided there. *See Baker v. Dorfman*, 239 F.3d 415, 420–21 (2d Cir. 2000). In *United States v. Gomez,* we opted not to exercise our discretion where the record left us "with insufficient factual findings upon which to base a conclusion concerning reasonable suspicion." 877 F.3d 76, 93 (2d Cir. 2017). By contrast, here, the relevant facts known to the officers when they searched the Camaro's interior are undisputed. In such circumstances, the question of probable cause is a matter of law that we can decide. *See id.* at 92 (stating that appellate court more likely to reach issue not addressed by district court where "issue is purely legal and there is no need for additional fact-finding" (internal quotation marks omitted)); *Walczyk v. Rio*, 496 F.3d at 157 ("It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."); *see also, e.g., United States v. Wallace*, 937 F.3d 130, 137 n.2 (2d Cir. 2019) (exercising discretion to consider whether traffic stop was unconstitutionally prolonged, question unaddressed by district court but requiring no additional fact-finding and, thus, presenting only questions of law).

At the outset, we note that while the Fourth Amendment generally requires police to obtain a warrant before conducting a search, an "automobile exception" to this rule permits police "to conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gagnon*, 373 F.3d at 235 (quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004)); *accord United States v. Jones*, 893 F.3d 66, 70 (2d Cir. 2018). When stopped at the Mobil gas station, the Camaro was a readily mobile motor vehicle with access to the station's Locust Avenue exit. Thus, the lawfulness of the car search depends on whether it was supported by probable cause.

While more demanding than reasonable suspicion, "[p]robable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). It requires that "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient . . . to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Jones*, 893 F.3d at 71 (internal alterations and quotation marks omitted). To find probable cause, officers are not required "to rule out . . . innocent explanation[s] for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. at 588. As the Supreme Court in *Wesby* explained, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (internal quotation marks omitted).

46

When officers here searched the interior of the Camaro, they knew all the facts detailed *supra* at 19–20, which, as we have already explained, supported reasonable suspicion to think that the Camaro's occupants may have committed one armed crime and been pursuing another. By the time of the search, investigating officers also knew that,

1. occupants of the Camaro did not immediately respond to police exit orders;

2. during that period of delay, the driver (Patterson) appeared to reach behind the back seat and under the steering wheel;

3. when the occupants finally exited the car, officers could see that they fit the described number (two), sex (male), and race (black) of the menacing assailants; and

4. when police attempted to handcuff the occupants, the passenger-side occupant submitted, but Patterson fled the scene, with what appeared to be an object in his hand.

Considering the totality of facts, we conclude that, at the time of the Camaro search, officers had probable cause to think that evidence of criminal activity would be found in the vehicle. *See, e.g.*, *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021) (stating that probable cause determined by reference to totality of circumstances).

First, officers knew from the victim that, while in a ShopRite parking lot, she had been threatened with a firearm to reveal the location of an identified target sought by her assailants. Further, officers knew that, at the time of the armed menacing, the assailants

47

were driving a black or dark gray Camaro or Challenger. This information supports probable cause to think that, if that particular vehicle could be located, evidence of criminal activity would be found therein, not only materials confirming gun possession or use, such as ammunition, holsters, or even firearms themselves, but also physical materials or electronic devices linking the car's operators to the menacing victim or target, or revealing a motive for seeking the target. The basis to think such evidence would be found in the vehicle was only bolstered by facts admitting a reasonable inference that the menacing crime had recently occurred and that the perpetrators were then pursuing another victim. *See supra* at 25–26. Such circumstances made it improbable that the perpetrators would already have removed or otherwise disposed of incriminating evidence.

Second, officers knew that Camaros and Challengers were car models infrequently seen on local roads, particularly in winter. They also knew that the persons using such a vehicle during the recent menacing had been described as two black men. Thus, when, approximately ten minutes after first receiving a dispatch report of the armed crime, Officer Wirth spotted what he perceived to be a black Camaro leaving the ShopRite parking lot that was the scene of the crime, and when the occupants of that car turned out to be two black men, officers had probable cause to think that the vehicle was, in fact, the one driven by the menacing assailants and, thus, that it contained evidence of criminal activity.[25] This conclusion was

---

[25] As these facts indicate, it was not the occupants' race alone that supported probable cause to think that the car they were driving was the one used during the reported armed crime. Rather, it was that fact together with the (1) number and

reinforced by the fact that, shortly before Wirth spotted the Camaro, Officer DiRienzo reported seeing no such vehicle at the victim's residence, a location where officers thought it might have gone in search of the identified target.

Third, further supporting probable cause to think that incriminating evidence would be found in the stopped Camaro were Patterson's furtive actions upon being ordered to exit the vehicle. Our recent observation in *United States v. Weaver* that "[u]nusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis," 9 F.4th at 147, applies equally to the probable cause analysis, *see District of Columbia v. Wesby*, 138 S. Ct. at 587 (identifying "furtive actions" as factor contributing to probable cause); *United States v. Moreno*, 701 F.3d 64, 74 (2d Cir. 2012) (deeming "deliberately furtive actions" proper factor in probable cause analysis (quoting *Sibron v. New York*, 392 U.S. 40, 66–67 (1968))). Rather than promptly follow officers' exit orders, Patterson remained in the vehicle, where he appeared to be reaching for something behind the back seat and under the steering wheel. Such conduct made it probable that the "something" was either a weapon that Patterson was looking to access or conceal or some other incriminating evidence. Finally, when Patterson did exit the car, rather than submit to handcuffing, he fled the scene. "We have long recognized flight as an appropriate factor supporting a

---

(2) sex of the occupants in a vehicle (3) whose color and model fit the description of the suspect car, (4) which model was infrequently seen on local roadways, and (5) which vehicle was spotted exiting the parking lot that had earlier been the scene of the crime. Further, as we explain in text, still other facts pertaining to Patterson's conduct also supported probable cause.

finding of probable cause to search a vehicle after it is stopped." *United States v. Babilonia*, 854 F.3d 163, 179 (2d Cir. 2017). The Supreme Court agrees. *See District of Columbia v. Wesby*, 138 S. Ct. at 587 (identifying "flight" as factor contributing to probable cause).

Nor is a different conclusion warranted because Patterson appeared to have something in his hand as he fled. While the item in question may have been a gun, that was by no means a certainty. In any event, police were not required to eliminate that possibility in order to conclude that the totality of circumstances established a probability that one or more firearms, ammunition, or items confirming gun possession would be found in the Camaro, as well as other evidence incriminating the car's occupants in the reported armed criminal activity under investigation. *See generally id.* at 588.

In sum, the totality of information possessed by police officers prior to searching the interior of the Camaro was sufficient to establish probable cause to think that incriminating evidence would be found therein. Thus, the search was lawful under the automobile exception to the warrant requirement and provides no ground for suppressing seized evidence such as the loaded Makarov pistol. Having so found, we need not consider the government's alternative inevitable-discovery argument.

## CONCLUSION

To summarize, we hold,

(1) Evidence seized from a Camaro being driven by Patterson on January 30, 2019, including a Makarov pistol, should not have been suppressed as the fruit of an

50

unlawful *de facto* arrest because the detention of the vehicle and its occupants was, from its inception, a lawful investigatory stop.

(2) The investigatory stop was lawful because:

(a) it was supported by reasonable suspicion to think that the car and its occupants had participated in a recently reported armed crime and were pursuing further criminal activity; and

(b) the high degree of force used in carrying out the stop—four officers, impeding rear but not front movement of the Camaro, issuing exit orders at high volume, and pointing firearms at the vehicle—was supported by reasonable suspicion to think the vehicle's occupants were armed and dangerous, particularly before the occupants were sufficiently restrained to prevent them gaining access to one or more firearms then reasonably suspected to be in their possession.

(3) The search of the Camaro's interior was lawful under the automobile exception to the warrant requirement because the vehicle was mobile, and the search was supported by probable cause.

Accordingly, the December 27, 2019 order memorializing the district court's October 30, 2019 oral ruling suppressing evidence seized from the Camaro is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

51