**UNITED STATES of America,**
**Appellee,**

v.

**William COLON, Defendant–Appellant.**

**No. 00–1628.**

United States Court of Appeals,
Second Circuit.

Argued March 9, 2001.

Decided May 14, 2001.

Leslie C. Brown, Assistant United States Attorney, New York, NY, (Mary Jo White, United States Attorney for the Southern District of New York, Gary Stein, Assistant United States Attorney, on the brief), for Appellee.

Mark B. Gombiner, The Legal Aid Society, Federal Defender Division Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: JACOBS and CALABRESI, Circuit Judges, and ARTERTON, District Judge.[1]

ARTERTON, District Judge:

William Colon appeals from a judgment of conviction after bench trial in the United States District Court for the Southern District of New York (Kaplan, J.). He challenges the denial of his motion to suppress physical evidence and statements recovered during a stop and frisk. The sole question on appeal is whether caller information given to a civilian 911 operator working for the New York Police Department but not conveyed to the dispatching or arresting officer can be imputed to the arresting officer under the collective knowledge doctrine as a basis for reasonable suspicion to justify the search. For the reasons discussed below, Colon's conviction is vacated and the case is remanded for further proceedings.

## I.  Background

At 6:12 a.m. on February 6, 2000, a New

---

1. The Honorable Janet Bond Arterton for the United States District Court for the District of Connecticut, sitting by designation.

York City 911 operator[2] received a call from a woman who stated that she was outside an after-hours club at 1735 Rosedale Avenue in the Bronx and that "there's a guy inside that has a gun, and he hit me over the head with it, okay. It didn't, I'm not bleeding or anything, but he has a gun and he's dangerous, okay?". The caller also stated that "[h]e's male, okay, he's Hispanic but he looks white. He's got a red hat, a red baseball cap and a red leather jacket, okay? ... I guess he's Hispanic but he looks white. They call him White Boy. That's, he looks white. He's white." When asked if she wanted to leave her name and number, the caller stated "I don't care because he already hit me one time and Officer Alejandro has my report on him.... And, but I just don't want him to know that I was the one that called."

After some confusion about the address, the caller clarified that she was calling from 1735 East 172nd Street, between Noble Avenue and Rosedale Avenue. The caller also stated that she would not be there when the officers arrived because "I don't want him to see me. He's a drug dealer. I don't want to get killed. You understand? ... And this is the same guy that hit me over the face and I got 15 stitches like three weeks ago." The caller continued: "So they know. The cops know about the incident, so I don't have to give you my name. They know who I would be. You understand? ... If I leave you my name, and they start saying my name over there. I don't wanna be, you know, I don't want no problems because I have three children and I don't want to take no kind of risk." The 911 operator informed her that an officer

would be sent. The call lasted six minutes.

The 911 operator then made an entry into the computer system used to transmit call information to the NYPD dispatcher. The 911 operator's computer entry described the incident as a code "10–10" (a crime in progress) and included the location, a description of the suspect as a male Hispanic wearing a red hat and red leather jacket with the nickname "White Boy," and the facts that the suspect had a firearm and that the tip had come from an anonymous caller on a Sprint Spectrum cell phone, also listing the number.

The dispatcher then made a radio call for officers to respond to a "man with a gun case" at 1735 East 172nd Street. The dispatcher told the officers in the field that

It states ah male, Hispanic, in a after-hours spot. His name, it states, um, male Hispanic, name is 'White Boy.' He's wearing a red hat with a red leather jacket. It's anonymous. There's no call back at this time. Still waiting for, from the operator. Unit come back.

The dispatcher then told the field officers that "this call back is a cellphone. No further information."

Acting on the information provided by the dispatcher, two NYPD officers, Claude Rhone and Sean Smith, proceeded to the club. Inside the club, they observed Colon wearing a red leather jacket and a red baseball hat. Colon was not seen to engage in suspicious activity and there was no evidence that any criminal activity had occurred. Officer Rhone approached Colon, stopped and frisked him, and found a Bryco 9mm semi-automatic pistol in Colon's waistband. Colon was then arrested. He subsequently made a video-taped state-

2. In New York City, 911 operators are not police officers but rather civilian employees of the New York Police Department ("NYPD").

ment in which he acknowledged that he had possessed the gun.

## II.  Proceedings below

Colon moved to suppress the gun and his statement on the ground that the tip from the anonymous caller did not provide the officers with reasonable suspicion to stop and frisk him, under *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).  In opposition, the government argued that *J.L.* was distinguishable because here, the 911 operator had additional information that made the anonymous caller sufficiently reliable to establish reasonable suspicion.

Acknowledging that this was a "close call," the district court denied the motion to suppress because the tip leading to defendant's arrest had sufficient indicia of reliability to establish reasonable suspicion, and unlike the call in *J.L.,* was not "truly anonymous," as the caller "gave information to the police that she believed would have enabled the police to determine her identity and location.... The critical point for purposes of this determination is that the caller gave information which, on the face of it, indicates that she believed she was identifiable to the police." *United States v. Colon,* 111 F.Supp.2d 439, 442 (S.D.N.Y.2000).  The district court also noted that the caller "made it clear that she had a very sound reason for refusing to give her name during the 911 call, despite the fact that she believed that the police, in due course, could track her down," by reference to her recent assault report.  *Id.* In addition, the district court distinguished *J.L.* in that this call was recorded, thus avoiding the problem of reconstructing the nuances of hurried communications after the fact.  *Id.* at 442–43. Finally, the court observed, "here it is crystal clear that the caller had first hand knowledge of the alleged criminal activity."

*Id.* at 443.  Under these circumstances, the court had "no doubt that the tip provided adequate first hand knowledge of a crime and was sufficiently reliable to establish reasonable cause to stop and search the defendant." *Id.* Defendant does not dispute these conclusions.

The district court then determined that if the call had been received by a police officer, the stop and frisk would be permissible because the information received by the officer answering the phone would be sufficient to find the existence of reasonable suspicion and would be imputed under the collective knowledge doctrine to the dispatched officers who stopped Colon. *Id.* Defendant does not dispute this conclusion either.

Lastly, the district court concluded that although the civilian 911 operator was not a trained law enforcement officer, her knowledge could be imputed to law enforcement personnel because application of the imputed knowledge doctrine turned "not on the characteristics of the personnel among whom knowledge is imputed, but rather involve[s] practical assessments driven by the overall requirement of reasonableness." *Id.* at 444.  Considering the practical necessity of imputing knowledge among law enforcement personnel, the enormous cost of paying trained police officers to serve as 911 operators in a city the size of New York City, and the high volume of traffic through the 911 response center, the trial court concluded that the fact that the 911 operator was a civilian rather than a law enforcement officer did not render the stop and frisk unreasonable.  *See id.* at 445.  It is this critical conclusion that forms the basis of defendant's argument on appeal that the additional knowledge of the civilian 911 operator never conveyed to the dispatcher cannot be imputed to the dispatcher or the arresting officers, and that absent

that additional information, those officers lacked reasonable suspicion to search Colon.

After denial of his motions to suppress, Colon consented to a bench trial on stipulated facts to preserve the suppression issue for appeal, and was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## III. Discussion

### A. *Reasonable suspicion*

■ The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. 4. "Its 'central requirement' is one of reasonableness." *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 948, 148 L.Ed.2d 838 (2001); *accord Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In determining the reasonableness of a search, the intrusion on an individual's privacy interests is balanced against the search's "promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

■ In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court carved out an exception to the general rule requiring probable cause for a search, permitting an investigating officer briefly to detain an individual for questioning if the officer has a reasonable suspicion "that criminal activity may be afoot." The investigating officer may also frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *McCardle v. Haddad*, 131 F.3d 43, 49 (2d Cir.1997). In

determining whether there is reasonable suspicion under the totality of the circumstances, "the court must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.2000) (*quoting United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)).

In *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Miami Dade police had received an anonymous call reporting "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 267, 120 S.Ct. 1375. Although recognizing that anonymous calls may in certain instances provide sufficient indicia of reliability to justify an investigatory search, the Supreme Court concluded that the "bare-bones" call at issue was not adequately reliable, as there was no predictive information about the suspect's behavior that would permit the police to test the caller's knowledge or credibility before stopping the suspect. *Id.* at 270, 120 S.Ct. 1375.

■ The parties to this appeal agree that without the additional information known by the 911 operator, the stop and frisk would have been impermissible under *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375, and that the information known by the 911 operator, had it been known by an *officer*, would have been sufficient to allow an officer to stop and frisk Colon. Accordingly, the sole issue before the Court is whether the civilian 911 operator's knowledge may be imputed to the dispatching or arresting officers in the absence of any evidence that the 911 operator made any assessment of reasonable suspicion or was trained to do so. For the reasons discussed below, we hold that this information cannot be imputed to the law enforcement

officers and that defendant's motion to suppress should have been granted.

### B. *Collective knowledge*

■ Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation. *See United States v. Hensley,* 469 U.S. 221, 230–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir.1972). "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *United States v. Valez,* 796 F.2d 24, 28 (2d Cir.1986).

The collective knowledge doctrine was developed in recognition of the fact that with large police departments and mobile defendants, an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials. *See Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating

officer to rely on fellow officers to make the arrest."); *Hensley,* 469 U.S. at 230–33, 105 S.Ct. 675 (a *Terry* stop based on a flyer issued by a neighboring police department indicating that the suspect was wanted for investigation of a felony was permissible if "the officers who issued the flyer possessed probable cause to make the arrest"); *Williams v. United States,* 308 F.2d 326, 327 (D.C.Cir.1962) ("The whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime."); *United States v. Cutchin,* 956 F.2d 1216, 1217 (D.C.Cir.1992) ("Within modern police departments, the officer who receives information justifying an individual's detention often is not the officer who acts on the information. Daily bulletins, computer messages and radio broadcasts alert officers in the field about those suspected of criminal activity.").

The Government views this case as analogous to the flyer or bulletin cases in which probable cause for arrest was predicated on information known only by the police department that issued the flyer or bulletin. It argues that here the NYPD "as a whole" possessed sufficient information to support the stop and frisk. However, by not tracing the information back to any person with the training to make a determination of reasonable suspicion and relying instead on the collective knowledge of "the department" generally, the government's argument takes the collective knowledge doctrine too far afield of the reasons underlying its purpose.

■ A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting offi-

cers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect. *See Hensley,* 469 U.S. at 231, 105 S.Ct. 675 ("If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment."); *see also Cutchin,* 956 F.2d at 1218 (holding that the district court erred in excluding evidence of 911 tapes on which a police dispatcher allegedly relied in directing field officers to look for the suspect's car because the tapes were necessary to determine "whether the dispatcher had reasonable, articulable suspicion, without which [the field officer's] stop of Cutchin's car might not have been legal"); *Rogers v. Powell,* 120 F.3d 446 (3d Cir.1997) ("The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect."). Thus, application of the imputed knowledge doctrine requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified. *Cf. United States v. Shareef,* 100 F.3d 1491, 1504 & n. 5 (10th Cir.1996) (declining to extend collective knowledge doctrine where evidence showed officers had not communicated

with each other; " '[i]nformation scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest' ") (*quoting State v. Cooley,* 457 A.2d 352, 355–56 (Del.1983)) (internal quotations omitted).[3]

The two cases cited by the government imputing to an arresting officer the knowledge of a non-police officer both involved individuals with other specialized law enforcement training: an assistant district attorney, *Calamia v. City of New York,* 879 F.2d 1025, 1032 (2d Cir.1989), and an auxiliary police officer, *People v. Rosario,* 78 N.Y.2d 583, 578 N.Y.S.2d 454, 585 N.E.2d 766 (1991). In *Calamia,* this Court held that an arresting officer who had made no independent investigation of a witness' claim that she had been robbed nonetheless had probable cause to arrest a suspect where the police had received written instructions from the District Attorney's office to arrest the suspect following an investigation conducted by the DA's office, concluding that " 'where law enforcement authorities are cooperating in an investigation . . ., the knowledge of one is presumed shared by all.' " *Id.* at 1032 (*quoting Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)). *Calamia* thus supports the undisputed proposition that knowledge may be

---

**3.** Other circuits have applied the collective knowledge doctrine where no single officer has the requisite knowledge to supply probable cause or reasonable suspicion but two or more officers working closely on the investigation together have sufficient information. *See, e.g., United States v. Edwards,* 885 F.2d 377, 383 (7th Cir.1989) (allowing knowledge of officers working closely together at the scene to be imputed without requiring proof of actual communication where the officers made the arrest together); *United States v. Nafzger,* 974 F.2d 906, 911 (7th Cir.1992) ("when officers are in communication with each other while working together at a scene,

their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop or arrest)"). As there is no argument advanced that the 911 operator was working closely with any officer involved in the search, we need not determine today whether or under what circumstances knowledge known collectively by more than one officer but not by any single officer may be aggregated to provide reasonable suspicion or probable cause.

imputed among law enforcement officials, but provides no basis for the government's claim here that undisclosed information known by *any* employee of the NYPD can be imputed to the arresting officer to supply the constitutionally-required reasonable suspicion to search.

In *Rosario,* the New York court of appeals considered whether to extend New York's "fellow officer" rule, analogous to the collective knowledge doctrine, to information known to an auxiliary police officer assisting with the arrest of a suspect. The rule, permitting police to act on information received by fellow officers or departments, relies on the presumption that the "officer or department furnishing that information ... possesses the requisite probable cause to justify the warrantless arrest." *Id.* at 588, 578 N.Y.S.2d 454, 585 N.E.2d 766. As to whether auxiliary police officers are such "officers," the court made specific findings that "auxiliary officers are required to undergo an extensive training program. They must complete a 52-hour course which includes instruction in police science, *criminal law,* self-defense, first aid, *police procedure* and crowd psychology." *Id.* at 587, 578 N.Y.S.2d 454, 585 N.E.2d 766 (emphasis added). In light of this training and the purposes of the auxiliary police forces, the court concluded that "the 'fellow officer' rule is properly applied here because auxiliary Officer Hernandez possessed sufficient training and ability to make the determination that there was probable cause to support defendant's arrest." *Id.* at 587–88, 578 N.Y.S.2d 454, 585 N.E.2d 766.

In contrast, the record here contains no evidence of whether or how 911 operator training is directed in any way to developing that ability, and thus contains nothing from which to conclude that the operator taking the call was capable of determining whether reasonable suspicion for the stop

and frisk existed. The government has pointed to no cases imputing the knowledge of a person with no apparent training in assessing probable cause or reasonable suspicion to an arresting officer, and the Court's research reveals none. In the absence of any showing that any NYPD employee with the training, responsibility or authority to make a determination of reasonable suspicion ever had sufficient information on which to effect or instigate the stop and search of Colon, this Court cannot find that the *Terry* stop was reasonable.

Moreover, the government does not suggest that the NYPD dispatcher claims to have relied on any 911 operator assessment of the existence of reasonable suspicion when directing the field officers to the after hours club. Imputing information known only to the civilian operator and not conveyed to the dispatching and then arresting officers would extend the doctrine beyond its current jurisprudential parameters and vitiate the privacy safeguards of the Fourth Amendment and their requirement that an officer may conduct a *Terry* stop only if the officer has "a reasonable suspicion supported by articulable facts," *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), by permitting a search where *no* law enforcement officials ever had sufficient information to provide a reasonable suspicion for the search.

The government also does not argue that the arresting officers acted in objectively reasonable reliance on some assessment of reasonable suspicion made by the dispatcher, and as the record shows that the dispatcher did not direct the officers to search the defendant and made clear to the arresting officers that he had conveyed all the information he had received from the 911 operator, the record would not support such an assertion. This case thus

presents the inverse of *United States v. Santa*, 180 F.3d 20, 27–30 (2d Cir.1999), in which we found objectively reasonable the arresting officers' reliance on a statewide computer database that erroneously indicated that there was an outstanding arrest warrant for the defendant, declining to impute the knowledge of the court clerk who knew that the arrest warrant was invalid to the arresting officers. Here, the dispatcher and arresting officers acted on what they knew to be an anonymous tip containing descriptive but no predictive detail, which was clearly insufficient to provide a basis for reasonable suspicion to support the stop and frisk of Colon. This deficiency cannot be remedied by the existence of information within the knowledge of a person who could not and did not evaluate its sufficiency. The fact that the 911 operator turned out, after the fact, to have additional information which would have given the arresting officers reasonable suspicion cannot retroactively make their actions objectively reasonable. *Cf. Whiteley*, 401 U.S. at 565 n. 8, 91 S.Ct. 1031 ("Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless.") (citation omitted).

Finally, our determination here that the *Terry* stop conducted on February 6, 2000 violated Colon's Fourth Amendment rights because the information used by law enforcement officers as the basis for the search was constitutionally inadequate will not impair law enforcement operations in New York City, nor will it require New York to abandon the use of civilian 911 operators, two valid concerns voiced by the district court. It is important to emphasize that the source of the problem is not the fact that the operator was a civilian. The problem is two-fold: the 911 operator's knowledge could not be imputed to the dispatcher because the operator lacked the training to assess the information in terms of reasonable suspicion, and the operator failed to convey sufficient information from which the dispatcher, a law enforcement officer, could have concluded that a stop and frisk could be ordered, or from which the arresting officers could have concluded that a stop and frisk was appropriate. This problem presumably can be avoided by training 911 operators as to (i) the standards for evaluating the sufficiency of incoming information, or (ii) the type of information needed by law enforcement personnel and the importance of conveying this information to them, or (iii) both. Moreover, even under the circumstances here, the field officers who received the information from the dispatcher, knowing that it alone would not support a search of the suspect, nonetheless could have gone to the scene, ready to make their own trained observations and to take immediate action should the suspect's conduct give them reason to search. This course would serve the interest of public protection without running afoul of the Constitution.

## Conclusion

For the foregoing reasons, Colon's conviction is vacated, and the case is remanded for further proceedings consistent with this opinion.