People v J.M. (2024 NY Slip Op 50445(U))

[*1]

People v J.M.

2024 NY Slip Op 50445(U)

Decided on April 15, 2024

Supreme Court, New York County

Statsinger, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 15, 2024
Supreme Court, New York County

The People of the State of New York

against
J.M., Defendant.

Ind. No. 74747-22

For the People: Assistant District Attorney Jesse Matthew
For the Defendant: The Legal Aid Society, by Sarah Legler, Esq., and Timothy Pruitt, Esq.

Steven M. Statsinger, J.

This is a case about a 15-year-old arrestee who was consistently treated as an adult (at times, worse than an adult) for nearly 10 hours, even though the police knew his age within one minute of the arrest. He has moved to suppress the resulting physical evidence and statements. For the reasons that follow, the Court GRANTS that motion in its entirety.
On March 14 and 15, 2024, the Court conducted a combined Dunaway/Huntley/Mapp hearing in this matter. The People called four police officers as witnesses: Officer William Lleras, Sergeant Sean Aman, Police Officer Jessica Racioppo and Detective Gene Ruda. The People also entered into evidence, inter alia: surveillance video capturing the incident itself and its immediate aftermath (People's Exhibit 6); body-worn camera video footage from Officer Lleras (People's Exhibit 1), Officer Racioppo (People's Exhibit 4) and Sgt. Aman (People's Exhibit 3); a video recording of defendant's interrogation at the 10th Precinct (People's Exhibit 7), and; a sound recording of the radio runs relating to this incident. (People's Exhibit 2).
The defense called no witnesses, but entered into evidence two documents. Defendant's Exhibits A (Officer Lleras' Stop Report) and B (Officer Racioppo's scratch complaint report). The Court in large part, and unless expressly noted otherwise below, credits the testimony of the police officers.
This Decision and Order constitutes the Court's Findings of Fact and Conclusions of Law.
I. Findings of Fact
A. The Incident and Its Immediate Aftermath
The incident occurred on September 15, 2022, at approximately 2:16 p.m. Surveillance video from a pet store located at 288 Eighth Avenue, near West 25th Street, in New York County [*2](People's Exhibit 6), appears to show the entrance to the store from an interior camera; the door is glass and the vestibule outside is visible. To the right, there is a partial view of the sidewalk through a large window.
Approximately 5 minutes and 57 seconds into the video, an individual wearing a red or orange hooded sweatshirt, black pants and sneakers and wearing a backpack, exits a business next door to the pet store. That individual appears to remain on the sidewalk. At approximately 6 minutes and 19 seconds, or 22 seconds later, another individual can be seen in partial view on the sidewalk outside, heading toward the pet store. He is walking a small dog and is carrying what appears to be a large stick.
Once outside the pet store, this person, the complainant Brad Boonshaft, is now clearly visible. He stops, turns to his left, away from the door and toward the sidewalk, and appears to be engaging in a conversation. His interlocutor is not visible. This interaction lasts for approximately 18 seconds, after which a person in a red or orange hooded sweatshirt, who appears to be the same individual that exited the business next door 40 seconds earlier, attacks Mr. Boonshaft, beating him with his fists about the head and upper body with what appears to be great force, while Mr. Boonshaft appears to try to repel him with his stick. The beating lasts approximately 7 seconds, after which the attacker runs off. The video shows the attacker on the sidewalk outside of the store, dropping his backpack as he runs, then returning to the area, where he turns to look at Mr. Boonshaft and collect the backpack, before leaving the area for good.
Mr. Boonshaft can be seen making a phone call, then appears to be doubled over in pain outside of the store. Eventually, he is admitted to the store, still with his dog and the large stick, and takes a seat on a bench. Someone hands him a cloth, which he applies to his forehead. He then moves to a different seat in the store and remains largely out of view. Two police officers arrive less than 8 minutes later.
One of those officers was Officer Racioppo. She testified that she and her partner arrived at the pet store in response to a radio run about an assault in progress. (Hearing Transcript, "H." 68). She interviewed Mr. Boonshaft, who gave his account of what had happened. H. 68. Her body-worn camera footage (People's Exhibit 4) shows her and her partner interacting with Mr. Boonshaft, both inside and outside of the pet store. When Racioppo's partner asks him whether he would be willing to canvass the area to try to locate his attacker, Mr. Boonshaft says that he needs medical attention, but agrees to participate in the canvass first. He also describes his attacker as a black male with dyed red hair and sunglasses, wearing an orange hoodie. H. 69.
B. The Apprehension of the Defendant
That same afternoon, Police Officer Lleras was on patrol with at least one other officer and Sergeant Aman in a marked police vehicle. H. 10-11. At approximately 2:20 p.m., they responded to the same radio run as Racioppo. H. 11. The radio run gave an approximate location and, in Lleras' account, the following description: a male Black or Latino wearing a bright red sweater, black pants and had orange slash blond hair. H 11, 23.
In fact, the radio run, People's Exhibit 2, first contains a brief report of an assault in progress—a "34"—at 288 Eighth Avenue,—a store, with injuries, but no weapons. (52 seconds). It concludes by noting that the attacker had left the scene, and the attack happened 2 minutes ago. (56 seconds). There is no description in this communication. A follow-up radio call gives the following description: a male black, around 25 years old, wearing a bright red sweater, sunglasses, possibly Latino or Black, wearing black pants, orange-blonde hair. (1 minute, 42 seconds). At 2 minutes, 49 seconds, the radio announces that they don't know the direction of the suspect's flight. People's Exhibit 2, which is approximately 36 minutes long, contains no [*3]additional information about this incident, nor does it contain any information about the source of the information that it reported.
Lleras eventually located an individual, the defendant, who matched this "very unique" description, although Lleras claimed not to recall that the description also said that the attacker was approximately 25 years old, H. 23, about half a block from the location of the assault, on the southeast corner of West 26th Street and Eighth Avenue. H. 11-13.[FN1]
Lleras testified that they followed the defendant for a time in their vehicle for safety reasons, H. 12, until defendant entered the Penn South Playground, which is located on West 26th Street between Eighth and Ninth Avenues. H. 12. Lleras believed that defendant had noticed the police vehicle on the street and seemed to be looking for an exit, walking a different direction. H. 13. Lleras and two other officers then exited the vehicle and entered the playground, using two different entrances to prevent the defendant's escape. H. 14. The three officers then approached him. H. 14.
Sergeant Aman, in the same vehicle as Lleras, recalled first seeing the defendant at an outdoor restaurant at Eighth Avenue and West 26th Street. H. 50. They followed him to the playground and continued to observe. H. 52-53. Aman recalled that when he saw the defendant start to leave the playground, he told the officers to "go get him." H. 59.
Officer Lleras' body-worn camera video—People's Exhibit 1—shows the apprehension of the defendant. It is 2:46 p.m. Approximately one minute into the video, Lleras exits the vehicle and begins running toward the playground. There is another officer ahead of him, also running. Both are in full view of the defendant, who is in fact standing still. Approximately ten seconds later, the officers can be seen inside the playground, still running toward the defendant, who is alone. The two officers slow to a jog, then a walk, as they approach the defendant. The third officer is present, off to one side, some distance away. Lleras and another officer immediately flank the defendant on either side, grab both of his arms, pull them behind his back and place him in handcuffs. Defendant appears to be holding something and, as they are cuffing him, one of the officers tells him: "Drop it, drop it." (1 minute, 18 seconds). By this time, the third officer has moved closer. One second later, defendant asks, "What did he tell y'all?" and Lleras immediately replies, "We're gonna figure it out at the precinct, okay?" (1 minute, 21 seconds). See also H. 29.
After the defendant is handcuffed, an officer searches him, emptying his pockets. (Exhibit 1, 1 minute, 40 seconds). Once handcuffed, defendant makes several unprompted statements about the incident, such as, "Y'all didn't see that see he hit me too?" (2 minutes, 4 seconds), and, in substance, "That white guy came up to me, started it with me." (2 minutes, 28 seconds). By this time, the officers are escorting the defendant out of the playground to the adjacent sidewalk; the distance is unclear, but it takes them approximately 30 seconds to get to there. During this walk, Lleras asks the defendant how old he is and defendant replies, "Fifteen." (2 minutes, 40 seconds).
Throughout this encounter, until the defendant is escorted to a police vehicle at 2:50 p.m. (4 minutes, 14 seconds), he continues to make unprompted statements about the incident.
On cross-examination, Lleras admitted that his supervisor, a sergeant (per Defense Exhibit A, Lleras' Stop Report, the sergeant is named Robert O'Neill), rejected his initial written report of this encounter with the defendant. H. 34. Oneill determined that Lleras: (1) failed to explain to [*4]the defendant the purpose of the stop; (2) improperly searched the defendant before the show-up, and; (3) failed to conduct a pat-down before undertaking to a full-blown search. H. 34-35. He also concluded that there was no basis for the search. H. 35. See also Defendant's Exhibit B, at 2.
As a consequence of this, Lleras was required to undergo additional training and instruction. H. 35. That training consisted of verbal instructions to "take [his] time a little bit more ...because [he] fell into arrest protocol very quickly." H. 35. Lleras blamed this on his inexperience in conducting arrests preceded by a stop. H. 35. He agreed that he had gone to a full-blown arrest before proceeding with the stop procedures and Lleras blamed this on his tunnel vision, which led him to an "immediate arrest protocol." H. 35.
C. The Negative Show Up
Sergeant Aman, still in the car, telephoned other officers and told them to bring the complainant to that location as quickly as they could. H. 53. The video evidence does not reveal when Aman gave this order; however, Officer Racioppo received it and brought Mr. Boonshaft to West 26th Street, down the block from the playground. H. 70-71. From inside the car, Mr. Boonshaft said that he could not see, so they exited the car. H. 71. Mr. Boonshaft said he could see someone who resembled the attacker and asked for a closer look. H. 71. Sergeant Aman got out of his car and joined Mr. Boonshaft and the other officers.
Racioppo's body-cam video, People's Exhibit 4, starting at 16 minutes, 57 seconds, shows Mr. Boonshaft exit a police vehicle and walk slowly along West 26th Street, while Racioppo asks, "Is that him?" (17 minutes, 20 seconds). Mr. Boonshaft does not answer immediately. She then asks again, "Is that him?" and he replies, "I don't know.... I can't see." (17 minutes, 50 seconds). As they walk closer to the playground, Mr. Boonshaft says, "I'm sorry officer, I can't see." (18 minutes, 19 seconds). At this time, defendant is in police custody, still inside the playground, being walked to the sidewalk, escorted by three police officers—two on each side of him, and one behind. Once defendant is outside the playground and on the sidewalk (18 minutes, 59 seconds), Mr. Boonshaft is still unable to make an identification. He notes that the person who attacked him was wearing sunglasses, but the defendant is not.
While this is unfolding, however, Officer Lleras walks from the defendant to the officers that are with Mr. Boonshaft—Racioppo, Sergeant Aman and one other—and says, "He just told me they fought." (19 minutes, 3 seconds); H. 55. Several officers then have an inaudible conversation with the defendant and escort him to a police vehicle. (21 minutes, 30 seconds). It is approximately 2:50 p.m.
This same scene is captured on other video. Lleras' body-cam shows him approaching Mr. Boonshaft, who is accompanied by Racioppo and another officer, and shows Lleras telling them, "He just told me they fought." (People's Exhibit 1, 2 minutes, 59 seconds). Sergeant Aman's body-cam video — People's Exhibit 3 - shows Mr. Boonshaft saying, "I can't tell...because he had glasses on, the guy who assaulted me." (2 minutes, 50 seconds).
D. Defendant's Arrival at the 10th Precinct
Officer Lleras had no further involvement with the defendant after the negative show-up, H. 20, nor did Sergeant Aman, who instead remained with Mr. Boonshaft. H. 57.
Officer Racioppo and her partner brought the defendant back to the precinct. H. 72. She testified that, while defendant was being processed inside the lobby of the precinct, other officers removed his sweatshirt, shoes and pants. H. 72, 77. The clothing was vouchered as arrest evidence. H. 74.
Racioppo's body-cam video, People's Exhibit 4, reveals a good deal more than this, however. They arrive at the 10th Precinct at 2:58 p.m. During his intake, the defendant gives his [*5]date of birth to the officer taking his pedigree information as July 26, 2007. (31 minutes, 10 seconds). A few seconds later, a different officer directs the defendant to take off his pants; defendant refuses. (31 minutes, 57 seconds). He refuses again when the pedigree officer tells him to. (32 minutes, 15 seconds). When the first officer reaches out to touch the defendant's sweatshirt, he repels that as well. (32 minutes, 27 seconds).
The defendant is then searched (33 minutes, 40 seconds), told for the third time that he must take off his clothes—which he again refuses to do (35 minutes, 18 seconds)—and is brought to the juvenile detention room. H. 83; (35 minutes, 32 seconds). The room has a solid wooden door; when the door is swung open, there is a large sign visible on the interior side that reads, 
You Must Call the Juvenile Crime Desk [at] 646-610-JUVI if you have a juvenile in custody. (35 minutes, 34 seconds). There is no evidence here that anyone ever made that call.
Inside the cell, an officer directs the defendant to take his shoes off, but defendant, still in handcuffs, says, "I can't." (35 minutes, 43-49 seconds). An officer removes the cuffs and then the defendant takes off his sweatshirt, shoes, pants and earrings and gives them to the officer, leaving him in his undershorts and undershirt. (37 minutes, 15 seconds). The officers do not give him any clothing. H. 85. Thus, still wearing only his undergarments, defendant is then handcuffed to a bench. (38 minutes, 15 seconds). At this point, the defendant asks how he can go home. (38 minutes, 19 seconds). An officer gives a non-response along the lines of "we will sort that out later," and the officers all walk out of the cell. It is 3:08 p.m.
E. The Interrogation
Detective Ruda was assigned to this case approximately 4:00 p.m., after the police learned that Mr. Boonshaft was in critical condition. H. 89-91. Ruda went to the hospital at around 6:00 p.m. to interview Mr. Boonshaft, but Mr. Boonshaft was unconscious. H. 91-92. After a doctor explained the nature of Mr. Boonshaft's injuries, Ruda took a picture of Mr. Boonshaft and left. H. 92. Before returning to the 10th Precinct, Ruda stopped at the scene and spoke to witnesses. H. 114.
Back at the precinct, Ruda spoke to officers who had been at the scene, then attempted to identify the defendant's guardian. H. 92, 94. He did so by consulting a police-department database that lists all of a suspect's past arrests. H. 94. Ruda found a report detailing an arrest from the month before, and used the contact information from that report, which indicated that the defendant's guardian was St. John's Home for Boys. H. 95.
Just before 10:00 p.m., Ruda called St. Johns. H. 131, 136. The staff member he spoke to confirmed that per ACS, H. 132, St. John's was the defendant's guardian. H. 95. Ruda told her that they wanted to question the defendant and asked whether St. John's would send someone to attend the interrogation. H. 95. She told him she would reach out to the director of the facility. H. 95. Ruda eventually spoke to the director, who confirmed that St. Johns was the defendant's guardian, but told Ruda that they would not send someone to attend the interrogation. H. 96. He did, however, offer to find someone to pick up the defendant once the interview was over. H. 96. Ruda already knew by then that the defendant was 15 and was therefore being held as a juvenile delinquent. H. 110. It was 11:00 p.m. when Ruda decided that the defendant should be questioned, although the questioning did not begin until about 11:15. H. 96, 118. Ruda confirmed that the defendant remained in the juvenile detention room until he was brought upstairs to be questioned. H. 97. When the defendant was brought to the interview room, he was wearing pants and shoes, but only his undershirt. H. 97.
Ruda was present for the interrogation—as was the Assistant District Attorney who is now assigned to the case—but another detective, Kevin Carrig, actually conducted the interview. [*6]H. 90. Carrig read the defendant his Miranda rights, in the simplified form mandated for children, H. 100, and defendant agreed to answer questions. H. 104. He spoke to the detective for less than 40 minutes. H. 105.
The three videos contained in People's Exhibit 7 (which all show the interrogation, although from different angles) are largely consistent with Ruda's account. Detective Carrig begins the interview just after 11:15 p.m. (5 minutes, 20 seconds). He starts by telling the defendant that he "doesn't know a ton" about why the defendant is in police custody. (5 minutes, 42 seconds). He describes the upcoming interview as defendant's opportunity to tell his story. (6 minutes, 0 seconds). In response, defendant asks if the complainant is pressing charges, to which Carrig replies that he "doesn't know too much" about the circumstances of the crime (6 minutes, 11 seconds), but that he wants to hear the defendant's story. (6 minutes, 37 seconds). After again claiming that he does not know why the defendant is there (6 minutes, 43 seconds), Carrig tells the defendant, "You're the one who can tell me that story." (6 minutes, 46 seconds). Only then does Carrig administer Miranda warnings. Carrig does not advise the defendant that he had the right to have a parent or guardian present and, to the contrary, tells the defendant that no adult is coming to attend the questioning. H. 127, 136.
Post-Miranda, Carrig and the defendant discuss the incident for about 30 minutes (People's Exhibit 7 from 9 minutes, 34 seconds: starting at "tell me why you're here," to 40 minutes, 5 seconds: the detectives and A.D.A. leave the room).
Two minutes later, Detective Ruda reenters the room and takes pictures of the defendant's hands. (42 minutes, 10 seconds). Defendant is left largely unattended after that: the detectives occasionally reenter the room for brief periods, but do not question him further. About 25 minutes after the interview has ended, the detectives return to the interview room with a set of fresh clothes and a pair of shoes (1 hour, 6 minutes, 7 seconds). They take back the defendant's pants and shoes and he changes into the ones he has been given. (1 hour, 8 minutes, 0 seconds). Defendant is then left unattended for another 20 minutes or so; he is led from the interview room at 12:40 on the morning of September 16.
II. Conclusions of Law
A. The Defendant was Illegally Seized.
On the record of this hearing, it is impossible for the Court to conclude that defendant's encounter with the police was "lawful in its inception." People v. DeBour, 40 NY2d 210, 221 (1976).
The parties are in stark disagreement as to whether the defendant was subject to an arrest, which of course would have required probable cause, Id. at 223 (commonly known as a "Level 4" encounter), or a Terry stop [FN2]
(commonly known as a "Level 3" encounter), which requires only reasonable suspicion. Id. In the Court's view, however, the information available to Officer Lleras, who first detained the defendant, only created a "founded suspicion that criminal activity was afoot," and therefore could have only justified the common law right to inquire (commonly known as a "Level 2" encounter). Id. at 215-16 The specific reasons for this finding are set out in Section A(2), infra.
1. Defendant Was Arrested
An arrest occurs where the "intrusion on a person's liberty is of such magnitude that an individual's liberty of movement is significantly interrupted by police restraint." People v. Jones, 192 AD2d 265, 266 (1st Dept. 1991) (citation to Terry omitted). Of course, "[n]ot every seizure [*7]constitutes an arrest." Id. (citations omitted). Rather, an arrest is determined under an objective test that asks "what a reasonable man, innocent of a crime, would have thought had he been in defendant's position." Id. (citations omitted).
A Terry stop, by contrast, is an investigatory detention that might include a frisk or pat-down, but not a full-blown search. Terry, 392 U.S. at 19. A Terry stop is a seizure, but must be brief and truly investigatory in nature, People v. Ryan, 12 NY3d 28, 30 (2009), allowing, of course, for the additional intrusion of a pat down if the officer has the specific reasonable suspicion to believe that the person stopped might be armed and dangerous. People v. Russ, 61 NY2d 693, 695 (1984).
The detention of the defendant here had all of the hallmarks of an arrest, and virtually none of a Terry stop. With one exception, its length, this seizure was nothing like a true Terry stop. To be sure, the detention was in fact brief, as the defendant was in custody for only about 4 minutes from the time the officers approached and handcuffed him to the time he was placed in a police vehicle. However, the seizure was clearly not investigatory: Lleras never asked the defendant a single investigatory question, and the credible evidence shows that Lleras did not cuff the defendant for an investigatory purpose; for example, so that he could be held for a show-up. His true purpose in detaining the defendant was that Sergeant Aman, who was in the same vehicle as Lleras said, "Go get him," H. 59, and because Lleras, like Aman, believed that the defendant was preparing to leave the playground, which of course he had every right to do. H. 13-14. Lastly, not even a pat down was warranted—although the police conducted a full-blown search and not a pat down—because the officers had absolutely no credible reason to believe that the defendant was armed.[FN3]

This encounter was clearly an arrest, as revealed by the following facts: first, the officers wordlessly approached the defendant without explaining their reasons or even asking any questions. Cf. C.P.L. 140.15(2). Two officers immediately grabbed the defendant's arms from behind and rear-cuffed him. E.g., People v. Hernandez, 223 AD3d 751 (2d Dept. 2024); People v. Desmornes, 61 Misc 3d 224, 226 (Crim Ct. Queens County 2018) (once defendant was rear-cuffed, stop turned into an arrest). They ordered him to drop whatever innocuous object he was holding. People v. Camber, 187 Misc 2d 153 (Broome County Ct. 2000). They then subjected him to a full-blown search and, when the defendant asked a question about what was happening, the answer was: "We're gonna figure it out 
at the precinct, okay?" Emphasis added. H. 53. In totality, these actions are of such magnitude that "[the defendant's] liberty of movement was significantly interrupted by police restraint." Jones, 192 AD2d at 266. Having just been told that his next stop was the precinct, this child-defendant, like any reasonable person—whether a child or an adult—who has just been told that, would have understood that he was under arrest.
This determination is highly fact-specific, but there are several similar cases where this same conclusion was reached. In Matter of Martin S., 104 Misc 2d 1036 (Fam. Ct. Richmond County 1980), a juvenile was seized on the street and searched and transported against his will; this was indistinguishable from a formal arrest. The similarity to the facts here is readily apparent.
Another case that supports the Court's analysis is In re Victor M., 9 NY3d 84 (2007). There, the detention of the juvenile was an arrest and not a Terry stop because a temporary detention justifies only a frisk, not a full-fledged search, id. at 88, and because, assuming that transporting a suspect to the station house in handcuffs could ever be found to be only a [*8]temporary detention under De Bour, even a temporary detention is unlawful if it is not reasonable under the circumstances. Id. Here, similarly, there was a full-fledged search, not a frisk, and it is difficult to see how there could have been any reasonable need to bring this 15-year-old to the precinct for questioning, instead of following the ordinary procedures that apply to juvenile arrests. C.P.L. § 140.20(6); Family Court Act § 302.5. The police had a video of the assault itself, a description of the perpetrator that in many ways matched the defendant, and had already conducted a show-up. Thus, other than to further exploit the arrest and acquire incriminating statements, there was absolutely no urgent, let alone reasonable, need to question him.
This record therefore readily leads to the conclusion that the defendant was placed under arrest when the officers approached him, grabbed and handcuffed him, told him that he was going to the precinct, and conducted a full-blown search of his person. Indeed, in People v. McRee, 113 AD3d 557 (1st Dept. 2014), the People 
conceded that handcuffing the suspect 
by itself elevated his seizure to an arrest requiring probable cause. Accordingly, taking into account both the fact that the defendant was only 15 and the level of force used against him, the Court holds that the seizure was an arrest. See generally Matter of Ronald C., 107 AD2d 1053, 1053-54 (4th Dept. 1985) (juveniles are entitled to the same due process of law as adults thus the police may not seize a suspect, transport him to a police station and detain him for custodial interrogation without probable cause). (citations omitted).[FN4]

And, finally, it bears noting that both Lleras himself and his supervising sergeant believed that the detention of the defendant 
was an arrest, not a Terry stop. Lleras admitted that due to his "tunnel vision," he had fallen into "arrest protocol" very quickly and before proceeding with Terry-stop procedures. H. 36. Of course, the Court is not bound by the police department's own view of this encounter: whether the seizure of a suspect was an arrest or something else is, after all, a legal decision and not a matter of opinion. Nevertheless, for all of the above-stated reasons, the Court agrees with the NYPD. This was indeed an arrest, and not a Terry stop.
2. There Was Neither Probable Cause nor Reasonable Suspicion.
Lleras' decision to arrest the defendant was based on the following facts: (1) the defendant was observed in an area that was close to the reported location of an assault: (2) it was close in time to the assault, and; (3) the defendant partially matched the radio run's description of the suspect. Whether these facts are sufficient for a finding of probable cause is a close question. But here, since these facts were all conveyed by an anonymous radio run - one that contained no information about their source, and hence no means of determining their reliability - Lleras lacked probable cause. He did not even have reasonable suspicion. The radio run only gave him the common law right to inquire.
In Florida v. J.L., 529 U.S. 266, 275 (2000), the Supreme Court invalidated a Terry stop that arose from an anonymous tip because the tip lacked sufficient indicia of reliability to give rise to reasonable suspicion:
An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: it will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.
Id. at 272. See also People v. William II, 98 NY2d 93 (2002) (same). In the De Bour hierarchy, an anonymous tip gives rise to, at most, the common law right to inquire. E.g., People v. Rios, 27 Misc 3d 393 (Sup. Ct. Kings County 2010) (an anonymous tip may be sufficient to invoke a Level 1 inquiry, a mere request for information, or a Level 2 inquiry, the common law right to inquire); People v. Hill, 216 AD3d 551 (1st Dept. 2023) (anonymous tip justified only the common law right to inquire).
Accordingly, the Court is compelled to conclude that this radio run was an anonymous tip, just as the radio run was anonymous in J.L., because "[t]here is no audio recording of the tip, and nothing is known about the informant." 529 U.S. at 268. Indeed, it is hardly uncommon for a radio run that does not identify the source of the information to be treated as an anonymous tip. For example, in People v. Utshudi, 65 Misc 3d 1232(A) (Sup. Ct. Bronx County 2019), the court noted that, "based on the record before the court, which contains no evidence about who called the police to report a man with a firearm... what the police received here was an anonymous tip." There, absent reasonable suspicion, the stop of the defendant was illegal. Id. See also, People v. Bond, 116 AD2d 228 (1st Dept. 1986) (pre-J.L., a radio transmission derived from an anonymous source failed to establish reasonable suspicion).
Nor would it have mattered if the People had introduced into evidence the recording of the 911 call or calls - assuming that any existed or had been preserved - reporting this incident, even if they were not anonymous. United States v. Colon, 250 F.3d 130, 134-35 (2d Cir. 2001). In Colon, a 911 call, although anonymous, nevertheless contained enough other information to render it a reliable basis for reasonable suspicion. Id. at 134 (the information known by the 911 operator, "had it been known by an 
officer, would have been sufficient to allow an officer to stop and frisk [the defendant]"). Emphasis in original. But, since the 911 operator transmitted the details of the incident, but not the information that rendered it reliable,[FN5]
to a radio dispatcher, who then conveyed it to the responding officers, the officers lacked reasonable suspicion. Id. at 138. Information conveyed to a civilian 911 operator cannot be imputed to police officers absent evidence that the 911 operator made any assessment of reasonable suspicion or was even trained to do so. Id. Thus, "[t]he fact that the 911 operator turned out, after the fact, to have additional information which would have given the arresting officers reasonable suspicion [could not] retroactively make their actions objectively reasonable." Id. See also People v. Braun, 299 AD2d 246, 247 (1st Dept. 2002) (citing Colon).
The problem here is not on the front end—the radio run itself. No one would reasonably expect a radio dispatcher to broadcast the details about a 911 caller, even if they were known. The problem here is on the back end: officers who had anonymous information that was only sufficient to give them the common law right to inquire, but instead immediately effectuated a full-blown arrest.
[*9]3. All Evidence Derived from the Illegal Arrest Is Suppressed.
The hearing record suggests several items of evidence that must be suppressed as a result of this illegal arrest.
a. Statements Made at the Scene
The statements that the defendant made at the scene, even if spontaneous, were a fruit of the illegal arrest and are suppressed. Defendant did not say anything at all until Lleras and another officer were illegally placing him in handcuffs. To be sure, sometimes spontaneous statements are not treated as the fruit of an illegal arrest. E.g., People v. Felton, 238 AD2d 288 (1st Dept. 1997); People v. Duran, 171 AD2d 610 (1st Dept. 1991). But this is not always true. People v. Taveras, 155 AD2d.131, 138 (1st Dept. 1990) (defendant's statement, which the hearing court determined to be a spontaneous utterance, was nevertheless suppressed as the fruit of the illegal police conduct); McCree 113 AD3d at 557 (suppressing spontaneous statement made immediately after illegal arrest).
The People are treating the defendant's statements at the scene as admissions. However, it is apparent that the defendant would not have made any statements at all—his words were, in very large part, an effort to justify his conduct, a logical response from a child who has just been handcuffed—but for the illegal arrest. Spontaneity must be genuine and not the result of "inducement, provocation, encouragement or acquiescence." People v. Maerling, 46 NY2d 289, 302-03 (1978). The illegal arrest of the defendant was indeed the provocation for his statements because the defendant's decision to speak cannot be seen as an "independent act involving a calculated risk." People v. Gales, 264 AD2d 642 (1st Dept. 1999). Cf. People v. Madera, 153 Misc 2d 366, 370 (Sup. Ct. Bronx County 1992) (abandonment of gun was a spontaneous reaction to unlawful police conduct).
The combination of the defendant's youth, the suddenness and unexplained use of force to (illegally) arrest him, the needless—but forceful—command to drop whatever non-weapon he was holding, and the instantaneousness of the defendant's decision to speak as soon as he was illegally placed in handcuffs, together show that the defendant's statements were directly and solely prompted by the arrest, and were not the result of a conscious decision to speak. "[T]he time for reflection is not measured in minutes or seconds, it is measured by facts. The time must be long enough to make a choice, as the result of thought and reflection, and to act upon the choice thus made." People v. Boodle, 47 NY2d 398, 404 (1979).
Thus, the Court concludes that defendant's on-scene statements were indeed a fruit of the poisonous tree and should be suppressed. E.g., People v. McCree, 113 AD3d 557 (1st Dept. 2014) (suppressing statement made moments after defendant was illegally arrested). People v. Brown, 82 Misc 3d 1216(A) (Sup. Ct. Kings County 2024) (spontaneous statements made at scene suppressed as fruit of poisonous tree—they were the direct consequence of unlawful police conduct).
b. Physical Evidence
Also obtained as the direct consequence of unlawful police conduct, id., were defendant's clothes, photographs of those clothes and the photographs of his hands, taken shortly after the detectives finished interviewing him. These, too, are suppressed.
c. Custodial Statement
Defendant's custodial statement must also be suppressed as a fruit of his unlawful arrest. Although made several hours later, the taint of the illegal arrest was not attenuated. Brown v. Illinois, 422 U.S. 590 (1975).
First, it is important to understand the nature of the taint identified in Brown: the [*10]coerciveness of the illegal arrest and the causal connection between that coerciveness and the making of a custodial statement. Id. at 603. Attenuation occurs only when circumstances have changed sufficiently that the statement is a product of the suspect's free will, and not of the residual coercion arising from the illegal arrest. Id. at 601. Miranda warnings may be sufficient to address Fifth Amendment concerns, but they do not, by themselves, extinguish the taint of a Fourth Amendment violation. Brown, 422 U.S. at 601-02. Rather, additional factors should be considered on the question of whether the taint has dissipated: the passage of time, any change in circumstances, and the purpose and flagrancy of the police misconduct. Id. Here, the Court finds that none of these factors, either alone or in combination, attenuated the taint.[FN6]

It is true that more than 8 hours passed between the illegal arrest and the taking of the defendant's statement. But the defendant spent virtually all of that time handcuffed to a bench, in his underwear, having been forced to disrobe in front of a woman while being filmed. And these same facts constitute the only change in circumstances: the defendant was quickly removed from the scene to the 10th Precinct, where he was then almost immediately forced to take off his clothes, and was then handcuffed to a bench for 8 hours before being questioned. These are hardly the types of changed circumstances that might eventually ameliorate the coerciveness of the illegal arrest. If anything, they 
increased the coerciveness of the situation. Compare Wong Sun v. United States, 371 U.S. 471, 491 (1968) (taint dissipated where defendant was released on his own recognizance following an unlawful arrest and returned to the police station voluntarily days later to make a statement).
Lastly, the purpose and flagrancy of the misconduct here fully support suppression. It is not just that Officer Lleras either actually knew or should have known that he was effectuating an illegal arrest; it is also that the police officers involved in this case—to a person—stubbornly insisted on treating this defendant like an adult, when he was in fact a child, even though they knew the defendant's age within one minute of arresting him.
This flagrancy analysis includes far more than the officers' utter failure to follow the protocols for the treatment of juveniles who have been arrested that are dictated by the Family Court Act, discussed in more detail below. Perhaps ordinary rank-and-file police officers cannot be accused of flagrancy in not following § 305.2 of the Family Court Act, with which they might not have had much familiarity.[FN7]
But they should definitely be charged with knowledge of the provision of the Criminal Procedure Law that governs the warrantless arrest of a juvenile, C.P.L. § 140.20(6). That section requires, in pertinent part, that when arresting a juvenile offender without a warrant, police officers must immediately notify the parent or other person legally responsible for his or her care that the person has been arrested, and of the location of the facility where the child is being detained. None of that happened here.[FN8]
In addition, unlike an adult [*11]suspect, a juvenile can only be questioned if an officer determines that it is necessary to do so. Id. The record does not show that this necessity determination was ever made, and in fact shows affirmatively that there was absolutely no need to question the defendant at all.
Other flagrant acts of misconduct include: (1) ignoring the large and visible sign on the inside of the door of the cell where they placed the defendant that said "You must call Juvenile Justice" and included the telephone number; (2) forcing this 15-year-old child to undress in front of a woman while being filmed, and; (3) forcing him to remain chained to a bench in his underwear for 8 hours, when in fact 
other clothes and shoes were available all along.
Defendant's custodial statements are accordingly suppressed.
B. Defendant's Custodial Statement was Involuntary.
C.P.L. § 60.45(1) provides that an involuntary statement may not be received in evidence against a defendant. A statement is involuntarily made when, inter alia, it is obtained from the defendant "by means of improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement." § 60.45(2)(a). When a defendant contests the voluntariness of a statement, the prosecution must prove beyond a reasonable doubt that, under the totality of the circumstances, the statement was voluntary. People v. Thomas, 22 NY3d 629, 641-42 (2014).
Here, the record as a whole—the totality of the circumstances—leaves the Court with a reasonable doubt as to the voluntariness of the defendant's custodial statement. This is not a case about physical coercion; it is a case about the psychological coercion of a 15-year-old child. Psychological coercion may be any method or technique that is "intended to, or may, play directly or indirectly upon the defendant, so as to instill in him a sense of fear, foreboding, insecurity or other feeling which will induce, motivate or compel him to waive his rights and respond to questions posed by law enforcement officers." People v. Zimmer, 68 Misc 2d 1067, 1074 (Wayne County Ct. 1972). The "party's maturity, intelligence, or sophistication in dealing with the police are significant in evaluating the coercive impact of police conduct. Young age or low intelligence... can play a crucial role in invalidating consent." People v. Weiss, 102 Misc 2d 830, 833 (Sup. Ct. NY County 1980).
The facts that have caused the Court to have a reasonable doubt as to the voluntariness of the defendant's statement are numerous. Those that have already been discussed in other sections of this Opinion will be discussed only briefly. Those that have not will be discussed in greater detail.
The first reasonable doubt as to voluntariness arises from the illegal arrest itself and the circumstances that caused the Court to conclude that the taint was not attenuated. See Section A(3)(c), supra. But there is one aspect of the lingering arrest-related coercion that the Court has not yet discussed in detail: the fact that, once he had been brought to the precinct, officers repeatedly ordered him to undress, and the defendant adamantly refused to do so. While still in the lobby of the precinct, he can be heard repeatedly saying, in substance, "I am not taking off my pants," and when an officer starts to go for the defendant's sweatshirt, the defendant physically repels him. The police only obtained his clothing once they had placed him in a cell, where they ordered him to undress while he was still in handcuffs. Only then did the defendant relent and attempt to comply.[FN9]
This act of overcoming the defendant's will was simply a precursor for the overcoming of his will later, when the detectives took his statement; by that [*12]time the defendant would have had every reason to believe that he had no choice but to comply.
Next are the repeated violations of Family Court Act § 305.2 and C.P.L. § 140.20(6). While the Court has already concluded that those violations, by themselves, do not warrant suppression of the resulting statement, see Footnote 7, supra, they are certainly material to the Court's voluntariness analysis. The legislative determinations that the police should treat children as children, and not as adults, have a purpose: to protect children from the trauma that the experience of a custodial arrest is likely to engender, to ensure that children are not coerced into incriminating themselves, and to ensure that they are quickly brought either home or to Family Court, which is experienced in the treatment of children and is better-resourced to do so than a police precinct. The wanton—and utterly needless—disregard of these protections further contributes to the Court's doubts as to the voluntariness of the defendant's custodial statement.
And finally, the circumstances of the custodial interview themselves create yet another doubt. Detective Carrig, who interviewed the defendant, used deception in a way that was clearly calculated to overcome the will of this child-suspect. Carrig several times pretended that he did not know anything about the case or "why [the defendant] was here," thereby soliciting the defendant's supposed "help" in figuring things out. He also repeatedly and falsely told the defendant that the interview was an "opportunity" to tell his side of the story.
Of course, neither of these lies at all reflected the reality of the situation, which was that the interrogation was not any sort of "opportunity," the police knew exactly what was going on, did not need the defendant's help, and, in truth, were simply bent on getting him to incriminate himself. The calculated nature of these falsehoods makes them particularly disturbing: a child would naturally be much more likely to respond to an adult's request for help than would an adult suspect, who would likely see right through the lie and understand that the police did not actually need his help at all. Similarly, the false characterization of the interview as an opportunity to give his side of the story and, implicitly, thereby exculpate himself, is just the type of lie that a child who knows that he is in trouble, and is hoping he can get out of trouble, would be highly likely to believe. See People v. Castro, 118 Misc 2d 868, 886 (Sup. Ct. Queens County 1983) (discussing the impact of a closely related type of deception—the lie that it would be "to his benefit" for the child to make a statement). That the defendant was Mirandized soon after these deceptions can hardly be seen has curing them. If anything, the Miranda warnings, which Carrig's lies in very large part contradicted, could only have left the defendant confused about whether he should speak or not.
Lastly, the Court notes that the Assistant District Attorney who is now assigned to the case was also present in the interview room. The Court does not in any way fault the A.D.A. for attending an interview in a matter that was surely of great interest to him, even though it was at that time a juvenile delinquency case over which his office had no jurisdiction. The problem is that, from the perspective of the defendant, the unexplained presence of a third adult in the room just made the entire episode even more coercive.
For all these reasons, then, the Court concludes that the People have failed to satisfy their burden of establishing, beyond a reasonable doubt, that defendant's custodial statement was voluntary.
III. Conclusion
Defendant's motion to suppress is granted in its entirety.
This constitutes the Decision and Order of the Court.
Dated: April 15, 2024
New York, New York
Hon. Steven M. Statsinger
Justice of the Supreme Court

Footnotes

Footnote 1:The Court does not credit this portion of Lleras' testimony. His own Stop Report, Defense Exhibit A, at 1, reports that the radio run reported that the attacker was approximately 25 years old, and Lleras had a perfectly clear memory of several other entries in that form. E.g., H. 34-35.

Footnote 2:Terry v. Ohio, 392 U.S. 1 (1968).

Footnote 3:The radio run actually specified that there were no weapons.

Footnote 4:It is certainly true that in many cases, handcuffing a suspect so that he can be brought to a show-up is not so intrusive as to constitute an arrest. E.g. People v. Barnes, 4 AD3d 433 (2d Dept. 2004). But this case is different in the level of coercion applied. Moreover, and in any event, detaining a suspect for purposes of a show-up requires at least reasonable suspicion, e.g., People v. Mendez, 255 AD2d 128 (1st Dept. 1998), and as detailed below, the Court has concluded that the police lacked even reasonable suspicion when they first approached the defendant. See Section A(2), infra.

Footnote 5:This was the radio run in Colon: "states a male, Hispanic, in an after-hours spot. His name, it states, um, male Hispanic, name is White Boy. He's wearing a red hat with a red leather jacket. It's anonymous. There's no call back at this time. Still waiting for, from the operator. Unit come back."

Footnote 6:Many of the facts relating to this issue also relate to the Court's decision on the voluntariness of the defendant's statement. They are laid out in more detail in Section B, infra.

Footnote 7:There seems to have been, at one time, a per se rule that violations of the predecessor statute to F.C.A. § 305.2, F.C.A. § 724, required that the resulting statements be suppressed. E.g., Matter of Aaron D., 30 AD2d 183 (1st Dept. 1968); Michelet P. v. Gold, 70 AD2d 68 (2d Dept. 1979). This is no longer the law, and the Court has not decided this case based on any vestige of the per se rule. Section 724 is still in force, but now governs only the treatment of persons in need of supervision, and not of juvenile delinquents who have been arrested. 

Footnote 8:Detective Ruda made no effort to contact a guardian until approximately 7 hours after the arrest; not exactly immediate.

Footnote 9:The police had to uncuff the defendant so that he could undress, but they then immediately cuffed him to the bench in the cell.